ROSADO *v.* THE PONCE RAILWAY AND LIGHT COMPANY.

APELACION procedente de la Corte de Distrito de Ponce.

No. 765.—Resuelto en junio 25, 1912.

DAÑOS Y PERJUICIOS—CONCLUSIONES DEL JUEZ SENTENCIADOR—ERROR MANIFIESTO—NUEVO JUICIO.—Las conclusiones del juez sentenciador deben estar de acuerdo con los hechos según aparecen en la relación del caso, pues de lo contrario no puede estimarse que la sentencia esté sostenida por los hechos. Si la corte ha hecho deducciones erróneas de los hechos según éstos han sido relatados y certificados por el juez, entonces éste ha cometido un error manifiesto que exige la revocación de la sentencia apelada y la concesión de un nuevo juicio.

ID.—CONTESTACIÓN JURADA POR EL DIRECTOR DE UNA CORPORACIÓN—SENTENCIA SOBRE LAS ALEGACIONES.—El director de una corporación de acuerdo con los artículos 118 y 132 del Código de Enjuiciamiento Civil tiene facultades para jurar la contestación de una demanda, sobre todo cuando en el juramento el declarante expresa que está mejor informado de los hechos que cualquiera otra persona.

ENMIENDA DE LAS ALEGACIONES—DISCRECIÓN DEL TRIBUNAL—ABUSO DE DISCRECIÓN.—Una corte tiene la facultad discrecional de permitir que se enmiende el *affidavit* de una contestación a la demanda, y este tribunal no intervendrá en el ejercicio de dicha facultad discrecional por el tribunal sentenciador, a menos que se demuestre que ha abusado de la misma.

ID.—AFFIDAVIT DEFECTUOSO—ENMIENDA CONCEDIDA PERO NO HECHA.—Cuando el tribunal sentenciador permite que se enmiende un *affidavit*, y dicha enmienda no se hace por la parte interesada en ello, y ambas actúan bajo la creencia de que la enmienda fué hecha, carece de importancia cualquier error que haya podido cometer el tribunal sobre este particular.

RES GESTAE—EVIDENCIA—MANIFESTACIONES HECHAS POR EL LESIONADO A SU MÉDICO MUCHO TIEMPO DESPUÉS DEL ACCIDENTE.—Las manifestaciones hechas por el lesionado a su médico mucho tiempo después de ocurrido el accidente, no pueden considerarse como parte de la *res gestae* y por tanto no es admisible la declaración de dicho médico relativa a las citadas manifestaciones.

EVIDENCIA—DECLARACIÓN PERICIAL—ADMISIÓN POR EL DEMANDADO DE LA CAPACIDAD PERICIAL DE UN TESTIGO.—Admitida por el abogado del demandado la capacidad pericial de un médico para declarar acerca de la intensidad mínima

de una corriente eléctrica necesaria para producir las heridas y quemaduras mortales sufridas por el lesionado, no puede dicho abogado pedir la eliminación de las contestaciones dadas por el mismo testigo sobre las mismas cuestiones al ser repreguntado por el abogado de la parte demandante, fundándose en que no se había demostrado la capacidad del testigo para declarar como perito sobre la misma materia.

Id.—Preguntas Hipotéticas—Cuando son Admisibles.—Las preguntas hipotéticas únicamente son admisibles cuando se fundan en hechos que ya han sido probados en el juicio.

Id.—Exclusión de Evidencia—Preguntas Pertinentes.—Comete error el tribunal que excluye parte de la declaración de un testigo tendente a demostrar el estado de humedad del sitio en que el lesionado sufrió las quemaduras producidas por la corriente eléctrica, cuando de las conclusiones del tribunal sentenciador resulta que el no haberse probado el estado de humedad del sitio donde ocurrió el accidente, es una cuestión esencial, y teniendo en cuenta que la humedad aumenta la intensidad de una corriente eléctrica.

Accidente—Res Ipsa Loquitur.—El principio de *res ipsa loquitur* es de perfecta aplicación al presente caso y el tribunal inferior cometió error al no aplicar dicho principio a este caso.

Moción de Sobreseimiento (Non Suit)—Excepción Previa a la Prueba.—Al resolver una moción de sobreseimiento (*non suit*) por insuficiencia de la prueba del demandante, el tribunal debe admitir como ciertos todos los hechos a que se refiere la prueba presentada por el demandante. El declarar con lugar una moción de sobreseimiento (*non suit*) equivale a dictar sentencia fundada en una excepción previa a la prueba presentada por el demandante, y debe el tribunal conceder esta clase de mociones con gran cautela y únicamente en aquellos casos en que sea completamente clara la concesión de dicha moción.

Id.—Sobreseimiento (Non Suit) de Oficio.—Un tribunal puede, cuando las alegaciones y la prueba presentada por el demandante lo justifiquen, dictar de oficio una sentencia de sobreseimiento (*non suit*), aun sin pedirla una de las partes.

Daños y Perjuicios—Negligencia de una Compañía de Alumbrado Eléctrico—Aislamiento de los Alambres.—Es deber imperativo de una compañía de luz eléctrica dedicada al suministro de electricidad por medio de alambres tendidos sobre postes colocados en las calles de una ciudad, el mantener constantemente aislados dichos alambres para evitar su contacto con otros objetos, y la falta de cumplimiento de este deber por parte de la compañía constituye un acto de negligencia, cualquiera que sean las causas y los actos que han ocasionado el contacto de los alambres con otros objetos.

Id.—Negligencia Contributoria—Muerte por Electricidad—Causa Próxima e Inmediata del Accidente.—Aun cuando un trabajador no use el medio más seguro para pasar por encima de unos alambres eléctricos, que es de suponer que estén aislados, dicho trabajador tiene razón en suponer que el principal ha cumplido con su deber, manteniendo los alambres eléctricos completamente aislados, y si tal trabajador pasa por donde cree que es el sitio más conveniente, no es culpable de negligencia contributoria.

Id.—Negligencia Contributoria—Responsabilidad de una Compañía de Luz Eléctrica.—En el caso de autos se resolvió que el causante del demandante no fué culpable de negligencia contributoria al pasar un alambre del teléfono

por encima de los alambres eléctricos de la compañía demandada, que era de suponer que no condujeran una corriente eléctrica de más de 110 volts, por ser alambres destinados al alumbrado eléctrico de la ciudad de Ponce, y el interfecto tenía el derecho de confiar en que la compañía demandada había cumplido con su deber manteniendo completamente aislados sus alambres eléctricos, con lo cual pudo dicha compañía haber evitado el accidente.

ID.—NEGLIGENCIA CONTRIBUTORIA—EJERCICIO DE PRUDENCIA RAZONABLE PARA EVITAR EL ACCIDENTE.—Aun en el supuesto de que la persona que sufre un accidente sea culpable de negligencia contributoria, eso no le impide para que pueda obtener una indemnización por los daños y perjuicios sufridos por el accidente, si éste pudo haber sido evitado por la parte demandada ejercitando un cuidado y prudencia razonables.

ID.—CORPORACIONES DE SERVICIO PÚBLICO—RESPONSABILIDAD POR ACCIDENTES.— Las corporaciones de servicios públicos que explotan franquicias de importancia están obligadas a cumplir sus deberes para con las otras compañías, sus empleados, y el público en general, de modo que razonablemente eviten ocasionarles perjuicios como consecuencia de los medios peligrosos empleados para llevar a cabo dichos servicios públicos.

ID.—ALAMBRES ELÉCTRICOS.—FALTA DE AISLAMIENTO ADECUADO.—El dejar la compañía demandada que por espacio de siete años quedaran a descubierto sin inspeccionarlos, los alambres eléctricos que causaron el accidente en el caso de autos, y por los cuales corre una corriente eléctrica de intensidad mortal, que podría causar la muerte a cualquier persona que tocara dichos alambres, es una negligencia casi criminal que hace responsable a dicha compañía de la muerte del causante del demandante.

Los hechos están expresados en la opinión.

Abogado del apelante: Sr. *José A. Poventud.*

Abogados del apelado: Sres. *Hartzell y Rodríguez Serra.*

EL JUEZ ASOCIADO SR. MACLEARY, emitió la opinión del tribunal.

La presente acción fué entablada a nombre de María Luisa Rodríguez y Rosado, hija menor de Ramón Rodríguez Vázquez, por su madre Petra Rosado y Correa, en reclamación de daños y perjuicios por la muerte de su padre Ramón Rodríguez Vázquez, que se alega fué ocasionada debido a la negligencia de la demandada por medio de sus agentes y empleados. En 1 de agosto de 1911, se dictó sentencia contra la demandante a moción de sobreseimiento de la demandada, desestimándose la demanda por falta de prueba para basar en ella las alegaciones contenidas en la misma e imponiendo las costas a la parte contra quien se dictó la sentencia. La corte llegó a las siguientes conclusiones de hecho

en las cuales fundó su sentencia, las que conviene insertar ahora en toda su extensión, a saber:

"Primera. La corte estima probado: que Petra Rosado y Correa estaba legalmente casada con Ramón Rodríguez Vázquez, hoy fallecido, y que ambos son padres de la menor María Luisa Rodríguez y Rosado, la que a su vez es heredera de Ramón Rodríguez Vázquez, en unión de otra hermana menor que no había nacido en la época en que su padre Ramón Rodríguez Vázquez falleciera, ni había nacido tampoco cuando se presentó la demanda que ha dado origen al presente pleito.

"Segunda. La corte estima probado que Ramón Rodríguez Vázquez era un hombre de 22 años de edad, de constitución robusta y saludable, y que atendía al cuidado y subsistencia de su familia con el producto de su trabajo, o sea, con un peso diario que ganaba como empleado que fué por espacio de dos años próximamente, de la South Porto Rico Telephone Company, de esta ciudad de Ponce, y que su referida familia, esto es, su esposa e hija, dependían exclusivamente de él para su subsistencia.

"Tercera. La corte estima probado que el día 10 de octubre de 1910, en la calle Real o Carretera de la Playa de Ponce, y frente a la casa No. 28 de dicha calle, había dos alambres eléctricos que conectaban dicha casa con la línea general que suministra corriente eléctrica a las casas particulares para fines de alumbrado; que dichos dos alambres que así conectaban la referida casa estaban cargados con corriente eléctrica de intensidad desconocida; que esos mismos alambres estaban cubiertos con una capa protectora o aisladora de naturaleza desconocida, la que en algunos sitios se encontraba destruída, observándose en ellos descortezamientos o peladuras pequeñas, pero perfectamente visibles, a la simple vista, para cualquier persona que estuviera situada en la calle, debajo de los dos expresados alambres y tomara siquiera la precaución de mirarlos; que la intensidad de la corriente que ordinariamente discurre por los alambres que suministran luz a las casas particulares es de 110 *volts;* que la intensidad de la corriente de los alambres primarios, antes de pasar por los transformadores o aparatos propios para reducir la intensidad de las corrientes eléctricas, de los cuales hay dos grandes instalados en el barrio de la Playa, es de 2,220 *volts;* y que es de 500 a 550 *volts* la corriente que discurre por el alambre desnudo que suministra fuerza motriz eléctrica al trolley, y el cual alambre pasa por debajo de los alambres eléctricos de la línea principal, que suministran corriente a los que forman la toma o acometida de dicha casa No. 28, no estimando esta corte satisfactoriamente probadas las distancias que median entre el

alambre desnudo del trolley y los de la línea principal, y entre ese mismo alambre del trolley y los que forman la acometida.

"Cuarta. La corte considera probado que frente a la casa No. 28 y algo más arriba de los dos alambres eléctricos que forman la acometida de la misma, se encuentran los alambres de la línea general telefónica de la South Porto Rico Telephone Company, y que algo más abajo de los alambres de la acometida, se encuentra un balcón que no se ha probado exactamente a qué casa perteneciera, aunque parece pertenecer a la No. 28, pero que está situado a distancia tal de los alambres de la acometida que la cabeza de un hombre parado sobre su baranda se encontraría en nivel algo superior al de dichos dos alambres como para permitirle el examen de la cubierta o capa aisladora de los mismos por su parte superior, y poder determinar su estado o condición.

"Quinta. La corte considera probado que el expresado día 10 de octubre de 1910 y en la calle Real o carretera de la Playa, frente a dicha casa No. 28 que es una casa terrera, Ramón Rodríguez Vázquez, que se encontraba tendiendo una una línea telefónica, como empleado de la South Porto Rico Telephone Company, tomó un alambre de teléfono que se encontraba colgando hacia la calle, y después de enrollarlo, lo tiró por encima de los dos alambres eléctricos que forman la acometida de la referida casa, y al cogerlo nuevamente, por el otro lado de esos dos alambres, y tirar de él con ambas manos, fué levantado violentamente y arrojado contra el balcón de la casa contigua a la No. 28, o sea, la No. 26, recibiendo su cuerpo varias sacudidas fuertes, habiendo retenido los alambres entre sus manos por espacio de unos cinco minutos, y habiendo encontrado las personas que trataron de auxiliarle, gran dificultad para poder desprenderle del alambre.

"Sexta. La corte estima probado que el alambre del teléfono que tenía en sus manos Ramón Rodríguez Vázquez, en los momentos en que ocurriera el accidente a que se refiere el hecho anterior, estaba en contacto con los alambres eléctricos que forman la acometida de la casa No. 28, y que por virtud de tal contacto se trasmitió por el expresado alambre telefónico una corriente eléctrica de intensidad desconocida que se comunicó al cuerpo de dicho Ramón Rodríguez Vázquez, produciéndole profundas quemaduras, especialmente en ambas manos, que ocasionaron la formación de embolios, sobreviniendo como consecuencia de ellos y gradualmente una parálisis general que fué causa de su muerte, ocurrida en el mes siguiente, o sea en noviembre de 1910.

"Séptima. La corte no estima satisfactoriamente probado el grado mínimo de intensidad de una corriente eléctrica que es necesario para matar a una persona joven, fuerte, robusta y saludable como se ha

probado que era dicho Ramón Rodríguez Vázquez, ni estima la corte satisfactoriamente probado si dicho Ramón Rodríguez Vázquez, en los momentos en que sufriere el accidente, estaba o nó sudado, o si tenía o nó las manos o su cuerpo húmedo, ni tampoco estima la corte satisfactoriamente probadas las condiciones del lugar o sitio en que precisamente ocurriera el accidente, o sea, si dicho sitio o lugar estaba o nó completamente seco o completamente húmedo, o en parte seco y en parte húmedo.

"Octava. La corte estima que no se ha probado en forma alguna, que además del contacto de los alambres de la acometida de la casa No. 28 con el del teléfono que tirara Ramón Rodríguez Vázquez por encima de aquéllos, se hubiera establecido algún otro contacto entre los referidos alambres de la acometida y algún otro alambre que estuviera tendido en aquel sitio y que perteneciera a la compañía demandada.

"Novena. La corte no estima probado que la forma en que Ramón Rodríguez Vázquez procedió al desempeño de su cometido era la única que necesariamente tenía que utilizar para ello, ni estima probado que al hacerlo en esa forma empleara el debido cuidado y diligencia para evitar el peligro, que es de esperar de una persona de ordinaria prudencia, y especialmente de una persona que tuviera una práctica de cerca de dos años en trabajos de una compañía telefónica, como dicho Ramón Rodríguez Vázquez, y que realizara esos trabajos en un sitio que ofreciera un verdadero peligro, como estima probado la corte que ofrecía el sitio donde ocurriera el accidente, por la naturaleza altamente peligrosa de las corrientes eléctricas.

"Décima. La corte estima probado que Ramón Rodríguez Vázquez tenía otros medios a su alcance para realizar su cometido, los cuales le ofrecían una absoluta seguridad contra todo peligro de cualquier clase que fuera.

"Undécima. La corte estima probado que Ramón Rodríguez Vázquez fué culpable de negligencia contribuyente, y que ésta fué la causa próxima e inmediata de las quemaduras y lesiones que recibiera el día 10 de octubre de 1910, en la forma antes indicada, y las cuales ocasionaron su muerte.

"Duodécima. La corte no estima probado acto alguno negligente de la compañía demandada que fuera causa inmediata del referido accidente que ocurriera a Ramón Rodríguez Vázquez y que ocasionara su muerte.

"Décima tercera. La corte estima probado que los alambres eléctricos de la línea principal para el suministro de corriente eléctrica para fines de alumbrado, los dos que forman la acometida de la casa

No. 28, y el alambre desnudo que suministra fuerza motriz eléctrica. a los *trolleys* o carros eléctricos, todos ellos de la compañía demandada, se encuentran colocados a bastante altura sobre el nivel de la calle, de tal modo que ninguna persona que transite por ella pueda ponerse en contacto con ninguno de dichos alambres, y la corte considera también probado que ninguno de los referidos alambres, en el sitio en que ocurriera el accidente, o sea frente a la casa No. 28 de la calle Real o carretera de la Playa de Ponce, atraviesa por encima de tejado o azotea alguna, estando por el contrario situados a bastante distancia de las casas que se encuentran en ambos lados, de tal manera que ninguna persona que subiera a las azoteas de dichas casas podría ponerse en contacto con ninguno de los mencionados alambres.

"Décima cuarta. La corte estima probado que Ramón Rodríguez Vázquez tenía implícitamente el carácter, con respecto a la compañía demandada, de un mero *licensee,* o persona que como empleada de una central telefónica, se entiende autorizada por razón de su oficio para el desempeño de trabajos de cierta índole, entre ellos el tendido de alambres telefónicos, por encima, o por debajo, según sea el caso, de los alambres eléctricos de la compañía demandada, y la corte también estima probado que Ramón Rodríguez Vázquez, al no emplear el debido cuidado y diligencia en el desempeño de su cargo, y al utilizar para ello los alambres de la compañía demandada, traspasó los límites de su licencia.''

De los autos no aparece por qué la viuda y el otro niño del interfecto no fueron parte en este pleito o si habían entablado alguna otra reclamación por daños y perjuicios por igual motivo. La sentencia se funda en la supuesta negligencia contributoria por parte de Rodríguez, el interfecto, y en la falta de prueba con respecto a la negligencia de la compañía demandada. El apelante se opone a las conclusiones de hecho alegando que de los hechos establecidos por la prueba no pueden inferirse tales conclusiones, según aparecen en la exposición del caso contenida en los autos. Por tanto, conviene que primeramente examinemos las objeciones que han sido formuladas a las conclusiones de hecho y que las comparemos con la prueba que aparece de los autos. Las consideraremos por el orden en que han sido presentadas en los autos en tanto en cuanto nos sea posible.

De un examen de las conclusiones de hecho podemos decir:

1°. La corte, en los párrafos 3°. y 6°., estimó probado que los dos alambres que conectaban la casa número 28 con el alambre principal de la planta, tenían una corriente eléctrica de intensidad *desconocida*. Esto es ciertamente así, pero a la vez la declaración del Dr. Córdova demuestra que era mayor que la fuerza corriente de 110 voltas, y con respecto a este punto la declaración de éste ha sido corroborada por la del Sr. Curtiss, director de la compañía demandada. Bien pudo la corte sentenciadora haber fijado el *mínimum* de intensidad y que la corriente que conducía era mucho mayor.

2°. También se estimó probado en el tercer párrafo que los alambres mostraban algunas peladuras que podían perfectamente ser observadas a la simple vista por cualquier persona que estuviera parada en la calle y colocada debajo de los dos alambres con simplemente mirarlos. Resulta de la evidencia que era necesario fijarse atentamente para ver las partes descubiertas del alambre, y hay prueba de que las mismas no podían verse en manera alguna desde la calle. Se ha dicho también que las partes descubiertas eran del mismo color como las demás del alambre y que la única diferencia consistía en el menor tamaño del alambre en los sitios descubiertos. Esto ha quedado demostrado por las declaraciones de Quintana, Vázquez, Pedro J. Coll, José V. Coll, y Ramos.

3°. La corte sentenciadora en el párrafo quinto de sus conclusiones expresa que después de tirar el alambre del teléfono sobre los alambres de la luz eléctrica "el interfecto volvió a cogerlo por el otro lado de dichos dos alambres, y al tirar con ambas manos fué levantado violentamente y arrojado contra el balcón, etc.". Esta conclusión no está sostenida por la prueba que demuestra que Rodríguez no tiró del alambre telefónico sino que recibió dicho sacudimiento tan pronto como los alambres se pusieron en contacto. Esto ha quedado demostrado por las declaraciones

de Pedro Coll, Quintana y Ramos. La corte también parece hacer inculpaciones a Rodríguez por sostener los alambres por espacio de cinco minutos haciéndosele difícil a las personas que llegaban en su ayuda el separarlo de los alambres. Su contacto con estos alambres fué ciertamente involuntario y el juez apenas lo consideró de otro modo.

4°. La corte también en su séptima conclusión, expresa que no se "demostró completamente cuál fuera el grado mínimum de intensidad de una corriente necesario para matar a un joven robusto, como era el demandante," siendo este hecho suficientemente probado por la declaración del Dr. Córdova, que declaró que se necesitaba una corriente mayor de 110 voltas. No había necesidad de probar cuál era precisamente la intensidad mínima que se necesitaba, aunque esto hubiera podido hacerse. El médico ya había expresado que este mínimum variaba según las circunstancias que concurrieran al contacto.

5°. La corte asimismo en su conclusión séptima, dice que "no fué demostrado satisfactoriamente el hecho de si el referido Rodríguez estaba sudando o nó en el momento en que ocurrió el accidente;" esta conclusión no es compatible con la relación de hechos. El testigo José Coll declaró "que las manos del individuo estaban secas y que no había humedad alguna a su alrededor." Ramos dijo que "en sus manos no había lodo o humedad de ninguna clase." No aparece prueba en contrario.

6°. La corte continúa expresando en la referida conclusión séptima que no "creía que las condiciones topográficas del lugar en que el accidente ocurrió se hubieran demostrado completamente, o sea que tal lugar estaba completamente húmedo o seco, o en algunas partes seco y en otras húmedo." Hay abundancia de prueba que demuestra claramente que el sitio de referencia en que Rodríguez se encontraba parado estaba enteramente seco. Véanse las declaraciones de los testigos Quintana, Pedro J. Coll, José Coll, y Ramos, agregando este último como razón de su declaración, "que a pesar de el

hecho de que había estado rodando por el suelo no se había llenado de lodo.''

7º. La corte sentenciadora asimismo estimó probado en el párrafo noveno de sus conclusiones, que no se demostró que el interfecto ''adoptara el debido cuidado o diligencia para evitar el peligro, que es de presumirse adoptaría una persona de prudencia ordinaria, etc.'' Esta conclusión no está sostenida por la prueba como se verá más adelante en esta opinión.

8º. La conclusión décima expresa que el interfecto tuvo otros medios a su alcance para realizar su trabajo con entera seguridad, aunque claramente no aparece de la prueba cuáles fueron dichos medios o la manera como pudo proceder.

9º. La corte sentenciadora en sus conclusiones undécima, y décimacuarta con respecto a negligencia contributoria no se estiman justificadas, como se verá de los hechos expresados y discutidos posteriormente.

10º. La corte en su conclusión duodécima expresa que ''no estima probado acto alguno de negligencia por parte de la compañía demandada que fuera causa inmediata del accidente.'' Esta conclusión no es compatible con los hechos probados, según nuestro criterio, como se verá cuando discutamos la cuestión ampliamente más adelante en esta opinión.

11º. No es necesario examinar las conclusiones del juez sentenciador más extensamente en cuanto a las objeciones que contra ellas se formularon por el apelante, ya que en las que hemos examinado están comprendidos los principales puntos envueltos. Por supuesto, las conclusiones del juez sentenciador deben estar de acuerdo con los hechos, según aparecen en la relación del caso, o de lo contrario no puede declararse que la sentencia está sostenida por los mismos. Si la corte ha hecho deducciones indebidas de los hechos según los mismos han sido referidos y certificados por dicho juez, entonces éste ha cometido un error manifiesto que exige la revocación de la sentencia y la concesión de un nuevo juicio.

*Dyer* v. *Heydenfeldt,* Cal., 4 Pac. Rep., 1187; *Southern Cal. Ry. Co.* v. *Slauson,* 138 Cal., 343; *Hunter* v. *Milam,* 133 Cal., 603.

Por tanto, aunque la sentencia dictada por la corte inferior se fundó indebidamente en conclusiones erróneas que no están justificadas por la exposición del caso que fué aprobada por dicho juez, conviene, sin embargo, con el fin de hacer un examen acabado de estos autos en todos sus aspectos, que revisemos los supuestos errores según han sido especificados en el señalamiento de errores. De acuerdo con esto, los examinaremos por su orden en tanto en cuanto sea conveniente hacerlo y los discutiremos en relación con el resultado producido por los mismos según aparece de la sentencia. Son muy numerosos y ascienden a 16 los señalamientos, siendo por tanto, conveniente, que los presentemos en toda su extensión antes de comenzar a considerarlos.

Los señalamientos de errores, según aparecen en el alegato del apelante, son los siguientes:

"SEÑALAMIENTOS DE ERRORES.

"1º. La corte cometió error al negar la primera moción de la demandante solicitando una sentencia en mérito de las alegaciones presentadas.

"2º. La corte erró al negar la segunda moción de la demandante solicitando fallo en mérito de las alegaciones presentadas, después de permitir la enmienda al *affidavit* de la contestación.

"3º. La corte erró al no permitir a la demandante probar, por el testigo Dr. Ulpiano S. Córdova, la historia de la enfermedad y del accidente, cuando dicho doctor fué a recetar al lesionado, y que hiciera éste a dicho médico en aquel momento.

"4º. La corte cometió error al no permitir a la demandante probar, por el testigo Dr. Ulpiano S. Córdova, el voltaje mínimo que es necesario para producir las heridas que dicho médico observó en el individuo Ramón Rodríguez Vázquez, por cuanto dicho médico declaró haber estudiado electroterapia, haber examinado al individuo y conocer los efectos fisiológicos de una corriente eléctrica sobre una persona, habiendo admitido la demandada sus condiciones como perito médico y siendo la electroterapia asignatura que estudian en esa profesión.

"5º. La corte erró al no permitir a la actora probar por el testigo Dr. Ulpiano S. Córdova, el voltaje mínimum que sería necesario para producir las quemaduras que examinó en ese individuo, y cuál sería el voltaje mínimo que en medicina sería suficiente para producir quemaduras mortales en un individuo, por las mismas razones señaladas en el error que precede y por haberse opuesto la demandada sin fundar su objeción.

"6º. La corte cometió error al permitir probar a la demandada, por repregunta dirigida al Dr. Ulpiano S. Córdova, que la tensión eléctrica aumenta un poco teniendo las manos húmedas el individuo, toda vez que no se había demostrado antes que dicho individuo tuviera las manos humedecidas.

"7º. La corte erró al negarse a eliminar las cuatro repreguntas hechas por la demandada al testigo Dr. Ulpiano S. Córdova, así como las respuestas obtenidas, que aparecen todas bajo el número 7 del pliego de excepciones, por ser las mismas impertinentes y faltarles base en materia de hecho.

"8º. La corte erró al no permitir la pregunta de la demandante al testigo Francisco Quintana, acerca de si la cantidad de agua que se echa en la calle es tan voluminosa que se filtra por la superficie o sólo la moja, toda vez que dicha pregunta era pertinente y la demandada se opuso sin decir por qué.

"9º. La corte erró al desestimar la pregunta de la demandante al testigo Francisco Quintana, acerca de si estaba seguro que el sitio donde estaba el individuo estaba seco o húmedo, por cuanto dicho interrogatorio era pertinente, toda vez que la corte, en sus conclusiones, no estimó probado ese extremo, y la demandada se opuso sin decir por qué.

"10º. La corte erró al no permitir la pregunta de la demandante al testigo José V. Coll, acerca de si alguna vez había dado dicho testigo autorización a la compañía demandada para que instalase esos alambres o algunos alambres eléctricos en la casa No. 28 del camino de la Playa, por cuanto el objeto de la actora era demostrar que la compañía demandada había tenido durante siete años esa acometida sobre dicha casa, con corriente, en un sitio peligroso, sin utilidad alguna y sin autorización del dueño, según se alega en el hecho 5 de la demanda, habiendo quedado en consecuencia, sin probarse ese extremo de la demanda, que era una alegación esencial de la misma.

"11º. La corte erró al no permitir la pregunta de la demandante al testigo José V. Coll, acerca de si esa instalación en la referida casa durante los siete años que vivió allí el testigo, la ha utilizado en manera alguna, por cuanto la misma es material y tiende a demostrar, en

unión del anterior interrogatorio, el carácter de *trespasser* de la demandada en el momento del accidente y porque dicha demandada se opuso sin decir por qué.

"12º. La corte cometió error al no permitir la pregunta de la actora al testigo José V. Coll, acerca de si en esos siete años que vivió el testigo en dicha casa había pagado, o la compañía le había mandado a cobrar, algún *bill* o alguna cuenta por luz eléctrica en dicha casa, toda vez que dicha pregunta era material y tendía a los mismos fines que las dos que preceden, habiéndose opuesto la demandada sin decir por qué.

"13. La corte erró al declarar con lugar, después de terminada la prueba de la demandante, la moción de sobreseimiento (*nonsuit*) que presentó la demandada para que se declarase sin lugar la demanda, fundándose en que la prueba no había demostrado que hubiera negligencia por parte de la demandada, y de haberla, en todo caso, que existiría negligencia contributoria, toda vez que de la prueba presentada resulta claramente demostrada la negligencia de dicha demandada, probados los hechos esenciales de la demanda que permitió la corte, y en modo alguno resulta negligencia contribuyente por parte del finado, habiendo sido la causa eficiente de su muerte la negligencia de dicha demandada.

"14º. La corte erró al considerar, resolviendo dicha moción de *nonsuit,* motivos y fundamentos que no se especificaron al hacer la moción.

"15º. La corte erró al no estimar que, en Puerto Rico, en un caso como el presente, probado el hecho que causó el daño, se presume la negligencia de la demandada mientras ésta no justifique que ha observado la diligencia correspondiente a un buen padre de familia.

"16º. La corte erró al no estimar que en una moción de *nonsuit* se presume la verdad de toda la prueba de la demandante, y además cualquier hecho o hechos que legítimamente puedan inferirse de la prueba presentada; así como al no interpretar, en el presente caso, la evidencia presentada de la manera más contraria a la demandada."

Habiendo por tanto expresado en toda su extensión y literalmente los errores que han sido alegados por el apelante, podemos pasar a hacer un examen cuidadoso de los mismos. Conviene, teniendo en consideración las cuestiones tratadas en los mismos, que consideremos estos varios puntos en grupos, para ahorrar tiempo y presentar la cuestión de modo más claro, siendo a la vez comprendida más fácil-

mente: Los dieciseis señalamientos de error pueden por tanto, para los fines de esta discusión agruparse solamente en seis grupos, a saber:

I. Se ha alegado que la corte cometió error según se expresa en los señalamientos primero y segundo, al no conceder la moción del demandante, en la que solicitaba que se dictara sentencia sobre las alegaciones.

II. Alega el apelante que la corte cometió un error por lo menos cinco veces al resolver con respecto a la prueba del testigo Dr. Ulpiano S. Córdova, según se expresa en los señalamientos números 3°., 4°., 5°., 6°. y 7°.

III. Los señalamientos 8°. y 9°. alegan la comisión de un error al no permitir que se hicieran preguntas por parte del demandante al testigo Francisco Quintana, con respecto al agua de la calle y en relación con las condiciones del lugar en que ocurrió el accidente o sea si estaba húmedo o seco.

IV. Al examinarse al testigo José V. Coll, dueño de la casa número 28 de la calle de la Playa, el apelante alega que por lo menos tres veces se cometieron errores por la corte, según se especifica en los señalamientos décimo, undécimo, y duodécimo.

V. Alega el demandante que cuando la causa del accidente ha sido probada según se ha alegado que se hizo en el caso de autos, se presume que la demandada ha sido culpable de negligencia hasta que se demuestre por medio de alguna prueba que usó toda la diligencia posible que un buen padre de familia emplearía para evitar el daño. Esto se ha expresado en el décimoquinto señalamiento de error y ella se funda en el último párrafo del artículo 1804 del Código Civil de Puerto Rico, en donde se establece una regla de evidencia así como la responsabilidad.

VI. Alega por último el apelante, que la corte cometió un error fundamental al declarar con lugar la moción de la demandada sobre sobreseimiento y dictar sentencia en contra del demandante, como aparece más claramente especificado en los señalamientos de error 13°., 14°. y 16°.

1°. El demandante solicitó que se dictara una sentencia sobre las alegaciones, porque la contestación no estaba sostenida por *affidavit* según exige la ley. (Código de Enjuiciamiento Civil, arts. 118-132.) Una de las objeciones que se formuló al *affidavit* es que el declarante no ha demostrado estar autorizado para prestar dicho *affidavit*. Este dice que es el director y que está mejor informado con respecto a los hechos que ninguna otra persona. Esto es suficiente con arreglo al artículo 118 que expresa al final del mismo, "cuando una corporación es parte, el juramento puede hacerse por cualquier funcionario de la misma." El director puede perfectamente jurar la contestación.

Pero el otro defecto que existe en el *affidavit,* es que el mismo no determina según se ha jurado en las alegaciones de la *contestación* sino de la *demanda.* Este parece ser el caso al examinar el *affidavit.* Pero el abogado de la demandada confiesa este error que imputan al copista y dicen que quisieron expresar al hablar de "los hechos expuestos en la *demanda,*" en vez de "los hechos expresados en la *contestación a la demanda.*" Solicitaron permiso para enmendar el *affidavit* con respecto a este punto y le fué concedido por la corte. La corte tenía la facultad discrecional de permitir que se hiciera tal enmienda. Y es un hecho bien establecido que cuando tal discreción existe no podemos revisar la acción asumida por la corte sentenciadora en el ejercicio de dicha discreción a menos que se demuestre que ha abusado de la misma. (*Palace Hardware Co.* v. *Smith,* 134 Cal., 381; *Nicoll* v. *Weldon,* 130 Cal., 666; *Melde* v. *Reynolds,* 129 Cal., 308; *Gould* v. *Stafford,* 101 Cal., 32.)

Pero de todo lo que consta en los autos resulta que aunque se permitió por la corte que la demandada hiciera la enmienda al *affidavit,* ésta jamás se hizo. (Pág. 10, 18, 19, 20, 21, 80, 81 y 93 de los autos.) Este fué probablemente una simple negligencia por parte de alguna persona que no se conoce; pero debemos considerar los autos según ellos aparecen en la transcripción.

Sin embargo, aunque aparece de los autos que el criterio adoptado por la corte pudiera ser erróneo, resultan inmateriales cualesquiera errores que hubieran podido cometerse, puesto que ambas partes consideraron la enmienda al *affidavit* como realmente hecha. Esto no obstante, si se devolviera el caso a la corte sentenciadora a los efectos de la celebración de un nuevo juicio, dicha corte debe exigir que se haga formalmente la enmienda.

2º. El Dr. Ulpiano S. Córdova, fué llamado como testigo por el demandante. Como esta agrupación de los errores que han sido alegados se refiere conjuntamente a las cuestiones sobre las cuales declaró este testigo, conviene que insertemos toda su declaración. El declaró como sigue:

"El testigo Dr. Ulpiano S. Córdova Dávila; que es médico cirujano; que después de graduado ha estado en el ejercicio de su profesión ocho años, pero antes tuvo doce años de práctica médica: que tuvo ocasión de conocer al individuo Ramón Rodríguez Vázquez; que lo conoció allá por el mes de octubre del año pasado, que lo llamaron a verlo por primera vez, que antes lo había visto pero que nunca le había recetado; que el día que lo llamaron examinó a ese individuo; que examinó a ese individuo detenidamente; que presentaba quemaduras de tercer grado en la frente, en la nariz, en la cara, en el tórax, en el brazo izquierdo, y en una de las piernas, que no recuerda si era la izquierda o la derecha; que esas quemaduras eran intensas de tercer grado, con pérdida del tejido muscular; que examinando el estómago y los intestinos de ese individuo se notaba la crepitación del cuálido y había unas quemaduras horribles desde la víscera bucal hasta la intestinal, el corazón no funcionaba bien, el hígado estaba en mal estado, el vaso lo mismo, todo en mal estado; que a los diez o doce días después le dijeron que había muerto; que por el examen que hizo, por el carácter de las heridas y por el estado en que estaban sus órganos interiores puede decir que estas heridas han debido ser producidas por una fuerza inmensa, como por una descarga

eléctrica, por la electricidad; que ha tenido que ser por la electricidad; que en opinión del testigo esas heridas fueron producidas por fuerza calorífica intensa, como de electricidad; que otra fuerza calorífica que la de la electricidad no ha podido producir heridas tan intensas ni del carácter de esas; que buscó en el vientre a ver si había zig-zag pero no lo encontró, sólo lo había en la frente; que la condición de la herida que presentaba en las manos era difícil asegurarlo por las diversas líneas que tiene la mano; que el olor que despedía era completamente pútrido; que una de las asignaturas que estudian los médicos en su profesión es la electroterapia, sobre los efectos de la electricidad en el ser humano. Que conocía a ese individuo de antes pero que nunca le había recetado, que era un individuo grueso, robusto, y aunque nunca lo examinó, su aspecto era de un hombre saludable; que suponiendo que ese individuo tuviera veintidós años, que fuera un hombre fuerte, robusto, saludable, sobrio, trabajador, de una musculatura vigorosa, en buena salud, sin haber padecido de enfermedades en sus órganos internos, opina el testigo que una fuerza eléctrica de 110 *volts* no hubiera sido suficiente para herirlo en la forma en que estaba; que el voltaje en la electricidad, médicamente hablando, es el grado de intensidad de la corriente; es la tensión de la corriente; que no sabe cómo se llama el volumen de la electricidad, que conoce el término voltaje en medicina, que estudian la cantidad de voltaje que es suficiente para matar a un hombre, una persona; que tuvo ocasión de estudiar todo lo que es necesario de electricidad para aplicar a un individuo, que es la *dosificación,* es la *posología,* que pudiérase llamar, de la electricidad que necesitamos para ciertas y tales enfermedades; que tienen también que estudiar los efectos del voltaje en relación con un individuo según la enfermedad, la cantidad de electricidad que pueda matar a un hombre; que voltaje es la intensidad de la corriente; que por los aparatos que usan puede el testigo apreciar la intensidad de la corriente; que eso tendría que referirse a una unidad, que es el voltaje.

¿Qué fuerza desarrolla ese voltaje? Resp. Hasta ahí no lle-
gan mis conocimientos. (Las cuatro últimas respuestas del
testigo fueron dadas a preguntas de la corte); que Ramón
Rodríguez Vázquez, aceptando que tuviera 22 años de edad,
que fuera un hombre robusto, saludable, sobrio, trabajador,
que pesaba ciento cuarenta y cinco libras más o menos, que
nunca había padecido enfermedad, con funciones completas
de sus órganos interiores, un hombre normal, situado en una
calle, en el lado de la calle correspondiente a la acera, en
tierra seca, sosteniendo un alambre telefónico que está sin
formar, cuyo alambre se pone en contacto con otros alambres
eléctricos, y suponiendo que por esos alambres eléctricos cir-
culara electricidad de una tensión o voltaje de 110 *volts* y que
ese alambre de 110 *volts* se pusiera en contacto con él en
las condiciones explicadas, cuyo individuo haya agarrado con
sus manos el alambre telefónico y al conectarlo con los alam-
bres eléctricos recibiera un sacudimiento que lo lanzara al
suelo, sosteniendo el alambre por espacio de cinco minu-
tos más o menos, sin poderse desprender de él, y mientras no
se podía despegar, recibía sacudimientos constantes por la
electricidad, en opinión del testigo, ese voltaje si hubiera sido
de 110, la corriente que circularía por los alambres eléctri-
cos en ese momento que se comunicó a ese individuo, no hu-
biera sido suficiente para producirle las quemaduras morta-
les que observó en dicho individuo Rodríguez Vázquez, se-
gún ha declarado. Que un individuo de las condiciones que
se describen anteriormente puede vivir de 60 o 70 años aquí
en Puerto Rico. Repreguntado por el abogado de la de-
mandada, dijo que todas las personas no tienen la misma pro-
pensión para resistir la electricidad; cada persona se puede
decir que tiene una condición diferente para resistir tanta o
más tensión de electricidad, que la potencia eléctrica que es
suficiente para matar a un hombre no produce ningún efecto
a veces, en otro hombre distinto, pero nunca el mínimum de
voltaje reconocido mata a ninguna, de modo que un voltaje
de 145 puede matar a una persona y el mismo voltaje no mata

a otra, pero el mínimum de 110 *volts* no mata a ninguna persona.   ¿En una persona que tenga las manos humedecidas, el efecto de 110 *volts* es el mismo que en otra que no las tenga? Resp.   Teniendo las manos húmedas aumenta un poco la tensión, que la ciencia no describe cuanto aumentaría, que se sabe que la tensión aumenta un poco pero no se sabe la cantidad. Que el efecto de una corriente eléctrica es diferente según el punto que toque la corriente, por ejemplo, una corriente dirigida por el plexo solar mataría indudablemente primero a una persona que si se dirigiera sobre las manos; que hay diferencia entre los efectos del choque según el sitio donde se aplica la corriente.''

La primer cuestión que surge en relación con la declaración del testigo Dr. Córdova, es la de si debió o nó habérsele permitido contestar la pregunta del demandante y exponer a la corte la manifestación que a él le hizo su cliente Rodríguez con respecto a las circunstancias del accidente y cómo fué que se quemó.   También debe tenerse presente que el testigo, según aparece de los autos, solamente tuvo una entrevista con su paciente y ésta tuvo lugar en el mes de octubre de 1910; que la lesión le ocurrió el día 10 de aquel mes y que Rodríguez falleció en 14 de noviembre siguiente. Debe haber sido próximamente hacia fines del mes de octubre cuando el doctor vió a su enfermo, pues éste dice que diez o doce días después le dijeron que el hombre había muerto. El relato expresado por el perjudicado fué referido a su médico mucho tiempo después del accidente para que sus manifestaciones puedan considerarse como parte de la *res gestae.* Estas manifestaciones eran simplemente de referencia y fueron debidamente rechazadas durante el período de la prueba del caso.

16 Cyc., 1246 y 1192 y casos citados.

La corte también se negó a permitir que el Doctor Córdova declarara como perito con respecto a cuál era el voltaje mínimum necesario para producir las heridas que el médico había observado en su paciente, y para producir quemaduras

mortales en su persona. Esta negativa se fundó en el hecho
de que la corte no consideró que el Dr. Córdova había demos-
trado reunir las condiciones como tal perito. Su declara-
ción muestra que reunía algunas condiciones como perito aun-
que tal vez no estaba muy familiarizado con la fuerza de las
corrientes eléctricas como lo están algunos expertos. Hu-
biera sido más acertado admitir su declaración en lo que pu-
diera servir y considerarla debidamente al hacer la corte sus
conclusiones de hecho. Pero la admisión hecha por la de-
mandada cuando el demandante estaba interrogando al doc-
tor para demostrar su capacidad como perito, es suficiente
para impedir que se formularan objeciones algunas a su decla-
ración como tal perito. De los autos aparece que la deman-
dada admite que el testigo posee los conocimientos y condi-
ciones necesarios para declarar como perito médico en este
caso. Por tanto, él reunía enteramente las condiciones para
poder expresar cuál era el voltaje mínimum que puede ha-
ber producido tales heridas como aquellas que observó en el
perjudicado y cuáles eran las que podían considerarse como
mortales. Esta es una cuestión que en la segunda década
del siglo 20 está al alcance de los conocimientos profesio-
nales de cualquier principiante en la moderna ciencia de la
medicina. El haber excluído tal declaración fué claramente
un error, especialmente si se considera esto a la luz de las
conclusiones a que llegó la corte en la cual fundó su sen-
tencia.

Pero por medio de este mismo testigo la corte permitió
a la demandada en el examen de repreguntas probar que la
fuerza de la corriente eléctrica aumenta ligeramente cuando
se aplica a una persona en sus manos, estando humedecidas,
a pesar de que no se presentó prueba alguna de que las manos
de Rodríguez estuvieran húmedas en aquella ocasión. Si
había de presumirse que las tenía mojadas debido al sudor,
puede demostrarse de acuerdo con las conclusiones de la corte,
que este hecho no quedó establecido por la prueba. Para que
las preguntas hipotéticas puedan ser admisibles, deben fun-

darse en hechos ya probados en el caso. No habiendo sido esto así, la admisión de esta declaración constituyó error. Este principio es tan conocido que apenas se hace necesario citar autoridades.

Por tanto, debió la corte sentenciadora haber declarado con lugar la moción del demandante para que se eliminaran de los autos las cuatro contestaciones hechas por el testigo Dr. Córdova, a las cuatro preguntas por parte del abogado de la demandada. Estas fueron las siguientes:

1ª. P. "¿Podría usted decir cuál es el aumento de la tensión?" 2ª. "¿Cuál es la regla aritmética?" El contestó: "La ciencia no la describe: sabemos que la tensión aumenta un poco pero no sabemos cuánto." 3ª. P. "¿Cree usted doctor, que el efecto de una corriente eléctrica, admitiendo que ésta sea de 110 voltas, es siempre la misma, cualquiera que sea la forma en que la conmoción se reciba y cualquiera que sea la manera en que se coja el alambre?" Contestó: "Es diferente; eso depende en el punto donde toque la corriente; por ejemplo, una corriente eléctrica aplicada en el plexo solar, mataría indudablemente primero a una persona que si se dirigiera sobre las manos." 4ª. P. ¿De modo que existe una diferencia según su declaración en los efectos producidos por el sacudimiento?" Contestó: "Sí, según el sitio en que se aplique la corriente."

Puesto que el testigo fué aceptado por el demandante como perito, y que como tal fué presentado, no puede ésta alegar ahora que estas contestaciones no eran admisibles debido a la falta de capacidad de dicho perito. Pero la objeción que contra ellas se ha formulado ha sido por considerarlas impertinentes y por carecer realmente de fundamento. No las consideramos así. Con ellas se trataba de probar o impugnar las cuestiones presentadas en las alegaciones y fueron debidamente admitidas y hubiera sido un error por parte de la corte el haberlas eliminado.

3º. Se hicieron al testigo Quintana por el demandante dos preguntas para probar la humedad o sequedad de la calle

y el sitio determinado en que se encontraba parado Rodríguez cuando sufrió las quemaduras por la corriente eléctrica. Estas preguntas fueron rechazadas por la corte. Se hace difícil comprender cómo pudo haberse considerado esta prueba como inmaterial o impertinente, especialmente porque de un examen de las conclusiones resulta que la corte consideró como una cuestión esencial el no haberse probado este hecho. No se formularon objeciones algunas a estas preguntas por parte de la demandada que proporcionaran alguna luz acerca de la cuestión. Según es bien sabido y aparece de la prueba contenida en los autos, que la humedad aumenta la fuerza de la corriente eléctrica, era ciertamente pertinente a las cuestiones en este caso el demostrar las condiciones de la tierra en y alrededor del sitio en que se encontraba parado el interfecto en el momento de recibir las heridas que le causaron la muerte. La exclusión de esta prueba constituye un error manifiesto y esencial.

4°. Alega el apelante que no debieron haberse rechazado ciertas manifestaciones del testigo Coll, pues que con ellas se trataba de demostrar una alegación esencial contenida en la demanda. La quinta alegación contenida en la demanda, es como sigue:

"Que según informes de la actora, el dueño de la referida casa No. 28 del camino de la Playa de Ponce, nunca consintió en el establecimiento de la referida acometida formada por dichos dos alambres eléctricos y desde que habita su indicada casa, hace ya algunos años, nunca ha utilizado la luz eléctrica de la demandada, no obstante lo cual, ésta ha permitido negligentemente que los indicados alambres permanezcan allí, como estaban en octubre 10 de 1910, conectados con la mencionada casa y debajo de dichos hilos telefónicos."

La demandante trató de demostrar con esta prueba que la compañía demandada había conservado por espacio de siete años con anterioridad a la muerte de Rodríguez, una conección eléctrica con la casa número 28, por medio de alambres que llevaban la corriente que produjo la muerte al interfecto, en un sitio peligroso y público sin beneficio alguno

para el dueño de la casa y sin su permiso, y que por consiguiente, la demandada era una *trespasser,* y que esta declaración era esencial y se hacía en apoyo de la quinta alegación expresada en su demanda. Debe notarse que no se formuló objeción alguna por parte de la demandada a este párrafo de la demanda, ni se presentó moción alguna para eliminarlo de los autos y que fué una de las cuestiones discutidas en el juicio de este caso. Indudablemente que la negligencia de la demandada era una cuestión importante, en realidad la principal cuestión del caso. Y si la demandada tuvo por espacio de siete años dos alambres innecesarios por los que pasaba una corriente que podía producir la muerte a una persona y que llegaba a una casa cuyo dueño no autorizó o deseaba esta conexión, esto por lo menos sería una circunstancia tendente a demostrar la negligencia de la demandada, según se ha alegado en la demanda. Por tanto, la declaración del testigo Coll acerca de este particular era pertinente y esencial y no debió haber sido rechazada.

5º. El décimoquinto señalamiento de error presenta una cuestión puramente de derecho, puesto que quedó completamente establecido el hecho de que la causa de la muerte de Rodríguez fué debido a la corriente eléctrica que pasaba por los alambres de la demandada. El artículo de la ley en que se funda el apelante o sea en el último párrafo del artículo 1804, (Código Civil, pág. 1215), dice lo siguiente:

"La responsabilidad de que trata este artículo cesará cuando las personas en él mencionadas prueben que emplearon toda la diligencia de un buen padre de familia para prevenir el daño." (Véase el Código Civil, art. 1804, párrafo último.)

El muy respetable comentarista Manresa, hace las siguientes observaciones en el artículo concordante del Código Civil Español:

"Que dicha responsabilidad cesa cuando las personas a quienes la impone el art. 1903, prueben que emplearon toda la diligencia de un buen padre de familia, estableciéndose en su virtud en dicho artículo una presunción legal de la culpabilidad de las personas citadas en él,

pues en razón a las relaciones de autoridad o superioridad que mantienen con los autores del daño causado, la ley presume que les es imputable la causa del mismo por su propia culpa o negligencia, considerándoles como autores morales de dicho daño por no haber puesto de su parte el cuidado o la vigilancia necesaria para evitar que aquéllos dieran origen a él, conforme con cuyo criterio se halla la sentencia de 18 de mayo de 1904 antes citada. Pero esa presunción establecida por la ley no es absoluta o *juris et de jure,* sino *juris tantum,* y por consiguiente, cede a la prueba en contrario.''

12 Manresa, 611.

El aplicar a este caso la doctrina de *res ipsa loquitur* constituye una tentativa por parte del apelante, la que está claramente explicada en la opinión del Sr. Juez Van Devánter emitida en el caso de *San Juan Light and Transit Co.* v. *Requena,* 224 U. S., 89. Esa parte de la opinión es como sigue:

''3. La·corte en sus instrucciones al jurado explicó en substancia que una compañía que provee de electricidad para fines de alumbrado ·y que tiene compromisos con el público de llevar una corriente eléctrica conveniente a las residencias y sitios de negocios por medio de sus instalaciones eléctricas, está obligada a ejercitar tal vigilancia en el negocio con el cual trafica y adoptar tales precauciones en la conservación e inspección de sus alambres y demás utensilios que sean razonablemente esenciales para impedir que una corriente excesiva y peligrosa pase por los alambres que suministran corriente eléctrica a aquellos alambres instalados en las casas de sus parroquianos, y entonces dijo:

'' 'Y se les instruye además que si creéis de la preponderancia de la prueba que el interfecto murió cuando sin tener conocimiento alguno de que había algún peligro usaba una luz incandescente para la cual se suministraba corriente eléctrica, por la compañía demandada, la presunción es que la compañía de luz eléctrica fué negligente e incumbe el demostrar que la fuerte y peligrosa corriente que llegó a los alambres no fué debido a ningún acto negligente por parte de la compañía.'

''Se formuló objeción contra esta instrucción por el fundamento de que en ella se había aplicado erróneamente la doctrina de *res ipsa loquitur*. Si bien se reconoció que esa doctrina era de carácter restrictivo y que cuando se hace mal uso de ella podría resultar perjuicio, creemos que no se cometió error alguno al aplicarla en este caso. El interfecto no tenía culpa alguna. El alambre principal de la deman-

dada tenía una corriente eléctrica de una tensión alta y mortal.   El
alambre secundario llevaba a su residencia una corriente excesiva y
peligrosa que solamente podía pasar por el alambre principal.   Si los
alambres y transformadores hubieran estado en buena condición, la
corriente excesiva y peligrosa no hubiera podido comunicarse al alam-
bre secundario, y por consiguiente, no se hubiera proporcionado el per-
juicio.   Estos alambres y transformadores estaban exclusivamente al
cuidado de dicha compañía y tenía ésta el deber constante de adoptar
las precauciones necesarias con relación al peligro que podía causarse,
para tenerlos en buenas condiciones.   Según el curso corriente u or-
dinario de las cosas, el daño no se hubiera proporcionado si se hubiera
tenido presente dicho deber por parte de la compañía demandada.
No solamente ocurrió el daño sino que inmediatamente después se
encontró que ambos transformadores no funcionaban bien.   Uno de
ellos estaba fundido y dañada su parte aisladora y el alambre de pro-
tección de tierra del otro se encontraba roto.   Además la compañía
demandada se comprometió a dar una corriente de pequeño voltaje
razonablemente segura y conveniente para el alumbrado, y la corriente
que suministró en esta ocasión era de alto voltaje, enteramente peli-
grosa e inadecuada para fines de alumbrado.   Estas circunstancias
demostraron de modo terminante la negligencia por parte de la com-
pañía demandada, no siendo necesario examinar mucho esta cuestión
para comprenderla.   Desde luego, que si la causa del daño fué una que
no pudo haberse previsto y evitado, entonces no había culpa; pero a
falta de una prueba en tal sentido o de alguna otra explicación, hubo
prueba bastante por la que el jurado estuviera justificado en declarar
culpable a dicha compañía.   Esto es lo que se quiso expresar en la
instrucción, interpretándola de modo razonable.   Esta no es un modelo
y de aparecer sola, hubiera estado sujeta a censura; pero si se lee a la
luz de los hechos anteriores y posteriores y del caso que se encontraba
ante el jurado, no podría entonces formularse objeción contraria.
Leída así en ella se declaraba correctamente y se hacía aplicación de la
doctrina de *res ipsa loquitur,* que consiste en que cuando una cosa pro-
porcione un daño sin culpa del perjudicado, se demuestra que está
exclusivamente bajo el dominio del demandado y el perjuicio o daño es
tal que en el curso ordinario de las cosas no ocurriría si aquel que
tiene tal *control* o dominio ejercita el debido cuidado, esto proporciona
evidencia satisfactoria a falta de una explicación de que el perjuicio se
ocasionó por la falta de cuidado por parte del demandado.   *Inland and
Seaboard Coasting Co.* v. *Tolson,* 139 U. S., 551, 554; *East End Oil Co.*
v.*Penn. Torpedo Co.,* 190 Pa., 350; *Alexander* v. *Nanticoke Light Co.,*
209 Pa., 571; *Trenton Passenger Railway Co.* v. *Cooper,* 60 N. J. L.,

219; *Newark Electric Co.* v. *Ruddy,* 62 N. J. L., 505; 2 Cooley on Torts, 3rd. ed., 1424; 4 Wigmore on Evidence, sec. 2509.''

Creemos que esta doctrina es de aplicación al' presente caso, habiendo, por consiguiente, cometido error la corte sentenciadora en no aplicarla. Esta omisión de la corte sentenciadora en dar efecto a los debidos principios de ley que rigen este caso fué un error fundamental, el que por sí solo exige la revocación de la sentencia.

6°. Llegamos por último a la cuestión fundamental. ¿Procedió correctamente la corte sentenciadora al declarar con lugar la moción de sobreseimiento de la demandada al concluir el demandante la presentación de su prueba? El apelante ha alegado varias razones para demostrar que dicha moción no debió haber sido concedida. No seguiremos precisamente el orden en que las mismas han sido presentadas. Se ha alegado que en una moción de sobreseimiento deben considerarse como ciertas todas las pruebas presentadas por el demandante, debiendo admitirse cualesquiera hechos que pudieran legalmente inferirse de dichas pruebas y se alega que esto no se hizo por la corte en el presente caso. El declarar con lugar una moción de sobreseimiento es equivalente a dictar sentencia fundada en una excepción previa, siendo esto en realidad una excepción previa a la prueba. Las mociones de sobreseimiento deben ser consideradas con cautela y concederse únicamente en aquellos casos que son completamente claros. Pero no existe nada en los autos por donde veamos que toda la prueba presentada por el demandante no fuera considerada por la corte como cierta, aunque pudiera ser el hecho que indudablemente es, de que distintas deducciones se hicieron de la misma, de aquellas que hizo el abogado del demandante. No incumbía a la corte dar a la prueba presentada por la demandante la mayor fuerza probatoria posible, sino que debe considerarse imparcialmente para ambas partes, como en todos los casos se hace y en cualquier estado de los procedimientos.

Pero ¿debió la corte al resolver la moción de sobresei-
miento haber considerado razones que no fueron alegadas en
la misma? No es necesario resolver si se hizo esto o no, pues-
to que la corte si hubiera estado justificado por el estado de
las alegaciones y de la prueba, pudo haber dictado la orden
por iniciativa propia declarando que el demandante no había
probado su caso sin tener en cuenta la acción que pudiera
tomar la demandada en el asunto, no habiéndose cometido,
por tanto, error en cuanto a este particular.

Pero ¿apareció de la prueba el hecho de que estuviera la
demandada completamente libre de negligencia o no se probó
que fuera culpable de alguna negligencia? Indudablemente
que no. Se probó claramente que la demandada permitió
que una corriente eléctrica pasara por su alambre principal
a la casa número 28 en donde no se usaba dicha corriente y
por acometidas que no se usaban desde hacía siete años por
lo menos. Y que estos alambres que conectaban estaban des-
cubiertos en sitios en donde podía escaparse esta corriente
y perjudicar a cualquier persona que por casualidad los to-
cara. Estos actos negligentes de la demandada han sido ad-
mitidos a los efectos de la argumentación, pero se ha con-
tendido que hubieran sido inofensivos a no ser por la negli-
gencia del interfecto.

No podemos admitir la sabiduría de esta serie de razo-
namientos. Es incompatible con los principios de ley enun-
ciados en las autoridades más recientes invocadas con mayor
aprobación, tales como el caso de Tolson y otros que en el
mismo se citan, que se comentan y están subsiguientemente
en esta opinión.

Además, según se ha resuelto en un caso de Louisiana,
es el deber imperativo de una compañía de luz eléctrica que
suministre electricidad por medio de alambres en lo alto, ex-
tendidos por las calles de una ciudad, conservarlos constan-
temente aislados con el fin de tenerlos en condiciones de que
no se pongan en contacto con otros objetos, sin tener en con-

sideración los hechos y causas que puedan ocasionar el contacto.

*Hebert* v. *Lake Charles Ice, Light & Waterworks Co.*, 11 La., 522; citando el caso de *Fitzgerald* v. *Edison E. I. Co.*, 200 Pa. St., 540; 50 Atl. Rep., 161; 86 Am. St. Rep., 732; y otros casos. Véase también *McLaughlin* v. *Louisville Electric Light Co.*, 34 L. R. A., 812; y *Haynes* v. *Raleigh Gas Co.*, 26 L. R. A., 813.

Pero se ha alegado que el infortunado Rodríguez, cuyo hijo trata ahora de que se le indemnice, fué culpable de negligencia contributoria, siendo ésta la causa próxima e inmediata de las intensas lesiones que dieron por resultado la muerte de dicho Rodríguez. Y la corte sentenciadora hace referencia a la siguiente doctrina sobre la cual debe fundarse la resolución de este caso, a saber:

"De esta serie de autoridades se deduce el principio inconcuso de que si la negligencia del demandado tiene un carácter pasivo y solo suministra el medio o la condición que en determinadas circunstancias puede ocasionar un daño, y esas circunstancias se ponen en movimiento y se producen por la voluntad y el acto independiente del demandante, de tal modo eficiente que sin ese acto no hubiera podido ocasionarse ese daño, ese acto independiente del demandante es la causa próxima del accidente, salvo el caso, que no es el de autos, en que el demandado, existiendo la negligencia del demandante, hubiera podido librarle del peligro y no lo hubiera hecho."

Pero parece que esta corte consideró anteriormente de modo distinto la ley aplicable a tales casos. En una opinión bien razonada y dictada el día 15 de enero de 1909 la corte se expresa como sigue:

"Hay muchos casos en que se resuelve que aunque un demandante podría ejercitando cautela, haber evitado el accidente, sin embargo, dicho demandante puede, a pesar de esto, ser indemnizado si se prueba que el demandado pudo haber evitado el accidente ejercitando el debido cuidado. (*Grand Trunk Ry. Co.* v. *Ives*, 144 U. S., 408; *Inland & Seaboard Coasting Co.* v. *Tolson*, 139 U. S., 551; *Davies* v. *Mann*, 10 Meeson and Welsby, 546-549, 19 English Ruling Cases, 190.)

"Los tribunales han resuelto que si un trabajador no emplea el medio más seguro al pasar por encima de alambres eléctricos, que supone están aislados, sin embargo de esto, él tiene el derecho de creer que el principal ha cumplido con su deber, y si tal trabajador pasa por donde cree que es más conveniente, no es culpable de negligencia contributoria. (*Clements et al.* v. *Louisiana Electric Light Co.*, 16 L. R. A., 43; *Perham* v. *Portland General Electric Co.*, 40 L. R. A., 799.)"
*Vargas* v. *A. Monroig e Hijos*, 15 D. P. R., 27.

Por consiguiente, veamos los actos ejecutados por Rodríguez en relación con la serie de incidentes que dieron por resultado las lesiones que le produjeron la muerte. Su propia manifestación del caso no aparece en los autos; sus labios han permanecido cerrados en el silencio y por lo menos para nosotros permanecerán siempre así, pero podemos obtener alguna información de la declaración de los testigos que aparecen en la transcripción de autos.

El testigo Francisco Quintana declaró como sigue:

"Que estaba sobre la empalizada de la casa de Mayol y frente a la casa esa. Que sobre la empalizada de Mayol había un alambre telefónico caído y muy cerca unos alambres de la luz eléctrica que iban a conectar con la casa No. 28; que estando parado en el portón vió a un hombre que cogía el alambre telefónico y lo tiraba por encima de los alambres eléctricos y al cogerlo, al otro lado, saltó para arriba con el alambre en las manos, sin poderse despegar; que corrió para allá y trató de despegarlo del alambre, pero no pudo; que en eso llegó José Coll y le dió unas gomas de bicicleta, que lo amarró con ellas y pudo despegarlo, llegando más gente, que unos lo sujetaron por los brazos y el testigo le tiró de la lengua para que no se ahogara, hasta que llegó el *trolley* y lo condujo al pueblo; que lo que hizo él fué tirar el alambre del teléfono por encima de la acometida de la luz eléctrica; que esas acometidas iban a conectar con la casa No. 28; que eran dos alambres; que cuando ocurrió el accidente Ramón Rodríguez Vázquez estaba parado sobre la orilla de la acera, yendo de aquí para allá a mano izquierda;

que cuando lo cogió ese sacudimiento él estaba parado en tie-
rra, porque todavía no había allí acera, que la acera la han
puesto después; que en aquel momento lo que había allí era
tierra; que por el medio de la calle estaba húmedo, porque
habían regado, pero donde él estaba parado estaba seco, por-
que el agua no llegaba hasta allí; que donde él estaba parado
no estaba húmedo, había polvo; que consiguió desprenderlo
del alambre con la goma de bicicleta; que mientras estaba
tratando de separarlo del alambre, ese individuo se movía
mucho y por la boca echaba humo; que se estremecía y tenía
grandes sacudimientos y se quejaba; que lo amarró con las
gomas por el cuello hasta que lo sacó; que por la goma no
se pasaba la electricidad; que llegó a cogerlo por los pies,
pero que temía que se le pasara la electricidad y lo soltó; que
inmediatamente después del accidente tuvo ocasión de mirar
debajo de los alambres eléctricos en la parte de los mismos
que quedaba por debajo; que no pudo encontrar por allí
ninguna capa o corteza de los alambres eléctricos; que se
fijaron como estaban los hilos del alambre eléctrico; que en
parte se veía más delgado y por otra parte más grueso, pero
no se podía precisar donde estaba el alambre desnudo; que
lo que percibió eran peladuras en el alambre; que esas pela-
duras eran pequeñas; que el alambre que sostenía Ramón
Rodríguez Vázquez parece que estaba en alguna de esas pela-
duras; que inmediatamente después del accidente vió que el
alambre del teléfono quedaba sobre una de esas peladuras;
que eso lo observó inmediatamente después del accidente; que
para observar esas peladuras había que fijarse; que esas
peladuras quedaban en la parte correspondiente al lado in-
ferior, pero está bastante alto; que pudo fijarse en el resto
de la corteza o cubierta de esos alambres eléctricos que iban
desde la línea del *trolley* a la casa esa, que como que les
faltaba corteza en partes; que en el sitio donde ocurrió el
accidente había peladuras en algunos sitios como de una pul-
gada; que esa parte es la que queda debajo de los hilos tele-
fónicos; que entre esos alambres de la luz eléctrica y los del

teléfono no hay alambres para impedir que se toquen unos
con otros; que después del accidente continuó trabajando allí
cerca; que trabajaban allí por temporadas, cuando hay ma-
dera; hay veces que están quince y veinte días trabajando
continuamente; que antes no se había fijado en los alambres;
que conoce algunos empleados del *trolley,* de la planta eléc-
trica, de vista; que uno de esos empleados forró, días des-
pués, los alambres que están en el sitio donde ocurrió el acci-
dente, que ha visto el alambre más grueso; que vió esos
alambres con un grueso forro después; que no recuerda cuán-
tos días después del accidente fué que vió ese nuevo forro;
que sabe que la tela que le han puesto lo ha llenado dema-
siado, está más grueso el alambre y por eso se ha fijado; que
ese individuo no se podía despegar del alambre; que el tes-
tigo lo vió y estuvo allí todo el tiempo hasta que se lo lleva-
ron; que vió las quemaduras que presentaba; que vió algu-
nas; que ese individuo botaba humo por la boca y por todo
el cuerpo; que hedía como a quemado. A repreguntas de la
demandada, dijo: Que vió a ese individuo cuando estaba ti-
rando el alambre del teléfono; que él tenía agarrado el alam-
bre del teléfono; que el alambre del teléfono estaba por la
parte de acá, él lo tiró por encima del otro y al cogerlo se
quedó pegado; que se quedó pegado al cogerlo, el alambre
estaba en el suelo después cuando lo tiró; que enrolló el alam-
bre y lo tiró sobre el otro; que pasó sobre el alambre de la
luz eléctrica al otro lado y entonces lo cogió; que estaba em-
patando el alambre; que trataría de entesarlo antes, pero
que eso no se puede hacer sin aparatos; que no hay necesi-
dad de estirarlo con las manos antes de entesarlo; que ha-
bía estado algún tiempo mirando ese alambre del teléfono
roto allí; que no puede decir cuánto tiempo estuvo roto ese
alambre del teléfono, que sería más de una semana, pero
tanto como un mes no; que ese individuo tenía las manos
descubiertas, desnudas, al coger el alambre; que no amarró
el alambre con cuerda alguna para entesarlo; que él cogió el
alambre del teléfono con sus manos desnudas, completamente

descubiertas; que cuando él tiró el alambre estaba parado en
la calle, en la tierra; que cuando cogió el alambre también
estaba en la tierra; que allí no había acera entonces; que se
acercó después que lo tiró y lo cogió; que la calle hacía una
media loma; que estaba más bajo el lado de la acera; que
momentos antes había visto el carro del riego; que allí no
había ninguna zanja; que el alambre del teléfono estaba ti-
rado sobre la empalizada de Mayol; que el alambre del telé-
fono, antes del accidente no estaba colgando sobre el de la
luz eléctrica, ni rozando con él, no lo tocaba; que no se había
fijado en el alambre de la luz eléctrica antes del accidente;
que después sí se fijó; que había que fijarse bastante, en el
momento del accidente, para ver que el alambre de la luz
eléctrica estaba descortezado; que podía verse desde abajo
que el alambre estaba descortezado; que podía verse que es-
taba en partes más delgado y en partes más grueso. A nue-
vas preguntas de la demandante contestó: Que ese indivi-
duo estuvo pegado al alambre sin poderse despegar como
cinco minutos más o menos; que cuando dijo a la parte con-
traria "al coger el alambre por el otro lado el individuo
lesionado," quiso decir que él tiró el alambre por sobre las dos
acometidas eléctricas; que al cogerlo, cuando cayó al otro
lado, fué que pasó el accidente; que estaba el testigo en un
sitio que podía verlo a él perfectamente; que ese alambre
él trataba de empatarlo con otro más adelante y más alto
en el siguiente poste; que tenía que pasarlo por encima de
esas dos acometidas para unirlos, que los alambres del telé-
fono siempre van por encima; que esa calle tenía una espe-
cie de loma; que la parte del camino de la Playa que da a
ese sitio en partes hace hoyos; que el sitio donde el indivi-
duo estaba se encontraba seco; que desde el sitio donde es-
taba parado el testigo, mirando por la parte superior del
alambre, se podía ver que era más fino; que no se podía
observar el alambre al desnudo por el motivo que tiene un
mismo color; que se ve del mismo color desnudo que con la
corteza; que hubiera sido necesario subir con una escalera

y tocarlo; que eso era por la parte superior solamente.. A
preguntas de la corte, dijo: Que cuando él tiró el alambre lo
tiró por encima de los alambres eléctricos que estaban ten-
didos; que allí arriba, en la parte superior, no había ningún
poste con cruceta.''

Julio Castillo declaró como sigue:

''Que estaba un alambre del teléfono sobre el alambre de
la planta eléctrica, sobre los alambres que venían de la línea
principal a dar luz a la casa; que no le consta si daban luz
a la casa o nó; que sólo sabe que estaban conectando con la
casa; que el sitio de los alambres eléctricos donde descan-
saba el alambre del teléfono era más delgado, parecía que no
tenía corteza; que ese descortezamiento estaba así en dife-
rentes sitios del alambre; que en otros sitios estaba también
el alambre descortezado; que en ese mismo sitio le han pues-
to una capa que no tenía el día del accidente; que para obser-
var el descortezamiento en los alambres eléctricos que caían
a la casa, tenía uno que fijarse un poco, porque el alambre
es todo del mismo color; que el alambre así desnudo se po-
día observar, porque está más delgado en unos sitios que en
otros; que eso fué lo que el testigo observó en la parte de
abajo del alambre; que se fijaba para ver que le faltaba cor-
teza en la parte de abajo, en la de arriba no podía verlo;
que el alambre de la acometida eléctrica estaba hacia la casa;
que miró desde el suelo; que el alambre estaba sobre su ca-
beza; que el sitio que podía ver desde el suelo era la parte
de abajo; que el alambre del teléfono caía por encima; que
le faltaba forro abajo, que ahora no puede decir si le faltaba
o lo tenía por la parte de arriba por estar debajo el testigo.''

El testigo Tomás Vázquez contestando a preguntas de la
demandada declaró como sigue:

''Que no se fijó si el alambre estaba cerca del sitio descor-
tezado; que para ver si estaba descortezado el alambre de la
luz eléctrica tuvo que subirse al balcón; que trató de ver
desde tierra y no pudo ver nada; que lo descortezado sería
cuestión de dos o tres pulgadas más o menos; que la parte

descortezada del alambre, se veía desde abajo más delgada que el resto del alambre, lo que se podía ver fijándose bien tal vez; que eso lo vió después del accidente; que antes del accidente no tuvo ocasión de ver el sitio ese.''

El testigo Pedro J. Coll declaró lo siguiente:

''Que él tiró un solo alambre del teléfono; que al coger el alambre del teléfono por el otro lado, después de haberlo tirado por encima de los de la luz eléctrica, fué que lo lanzó sobre un balcón; que lo lanzó a la casa siguiente a donde está la acometida eléctrica; que el sitio donde estaba el individuo de pie estaba seco; que en el centro de la calle había humedad, con motivo de haberse regado la calle con los pipotes del riego; que donde el individuo estaba no había llegado el riego porque aquél es un sitio llano; que en aquel entonces no había acera allí, que hoy sí; que el sitio donde estaba él es el sitio que ocupa hoy la acera; que él estaría pegado al alambre ese del teléfono cuestión de cinco minutos o cosa así; que él trataba de despegarse, pero no podía, fué muy fuerte la sacudida que le dió y tenía el alambre pegado de las manos; que pudo observar que mientras él tenía sostenido el alambre así, recibía sacudimientos de la corriente; que tan pronto él cogió el alambre que había tirado por encima de los dos de la luz eléctrica fué lanzado; que el estremecimiento fué tal que lo levantó de la tierra y lo lanzó contra el balcón; que eso sucedió tan pronto el individuo echó mano al alambre telefónico, al caer por encima de los dos de la luz eléctrica; que tan pronto se aproximó a ese individuo, pudo percibir un olor como a carne quemada; que no se fijó si por la lengua y por la boca botaba humo; que inmediatamente después del accidente tuvo ocasión de ver los alambres de la luz eléctrica, porque como la línea se quedó en el suelo y pudiera haber peligro se fijó en los dos alambres y pudo notar que el alambre había perdido algo, tenía algunas peladuras; que pudo notar que desde el poste a la casa en algunas partes estaba pelado el alambre; que se fijó en el sitio más próximo á donde estaba el alambre del teléfono, y ahí observó al-

gunas peladuras; preguntado: Si el alambre al descubierto
podía observarlo o no se veía, contestó: El alambre y la capa
que lo cubre tenían el mismo color y no se distinguía, pero
se notaba que en algunas partes estaba más grueso y en
otras más delgado; que ese descortezamiento del alambre
eléctrico supone que sería como de una pulgada; que en aquel
momento, debajo de los dos alambres eléctricos en el suelo,
no se encontraron pedazos del forro que cubre los alambres.
Repreguntado por la demandada, dijo: Que sabe que Rodrí-
guez tenía el alambre envuelto en una mano; que no puede
precisar si era con las dos manos, que sabe que lo tenía en-
vuelto en las manos; que él tiró el alambre del teléfono sobre
los alambres de la luz eléctrica; que cuando cayó al suelo
tiró del alambre, pero no tiró fuerte; que no trató de ente-
sarlo, para entesarlo el testigo ha visto que ellos usan unos
aparatos; que él tiraba del alambre pero no lo entesaba; que
él no tenía nada en la mano; que tirar del alambre y produ-
cirle las sacudidas contra el balcón fué en el mismo acto; que
tiraba con las dos manos, que él se envolvía el alambre con una
mano y después tenía que tirar de la otra.   A nuevas pregun-
tas de la demandante, contestó: Que al manifestar que ese in-
dividuo tiró del alambre del teléfono, quiso decir que tiró el
alambre del teléfono por encima de las dos acometidas y al
caer el alambre haló de él y al cogerlo fué eso; que esos dos
alambres de la acometida estaban flojos como hamaca; que
debajo de esos dos alambres eléctricos queda el alambre del
*trolley* en la parte precisamente de donde parten ellos de la
línea general de la planta; que el alambre ese vivo del *trolley*
quedaría como media vara retirado; que ese alambre del
*trolley* no tenía cubierta.   Repreguntado nuevamente por la
demandada, dijo: Que el alambre desnudo del *trolley* está
como media vara debajo del otro alambre; que no se fijó en
las distancias que hay del alambre del *trolley* al punto de
la acometida; que los dos alambres toman la electricidad de
la línea general, que está paralela a la del *trolley;* que no se
ha fijado a qué distancia están; que se fijó de la línea del telé-

fono con los dos alambres, que habrá como dos varas de distancia.''

José V. Coll declaró como sigue:

''Que no vió cuando él empezaba a tirar los alambres, que llegó después; que esos alambres eléctricos que conectaban con su casa vió que tenían algunas peladuras; que le faltaba el forro un poco; que había que fijarse para ver eso; que cuando se fijó observó que le faltaba forro, que se veía una parte más fina que la otra; que el alambre vivo, desnudo, por donde va el *trolley*, quedó a media vara o tres cuartos de vara de distancia de los alambres eléctricos que van a su casa; que los alambres eléctricos estaban un poco flojos; que en esa misma condición que observó esos alambres eléctricos en ese momento, los había visto todo ese tiempo; que no se ha mudado de esa casa en esos siete años que ha vivido en ella; que ese accidente ocurrió a la una más o menos; a repreguntas de la demandada, dijo: Que cuando vió a Rodríguez en el suelo estaban debajo los alambres; que tenía los alambres por debajo del cuerpo; que esos desperfectos que tenían los alambres de la luz eléctrica eran muchos y los tienen todavía; que eran de tamaño regular; que esos desperfectos se notan de abajo, de la calle, bastante bien; que en la época del accidente esos desperfectos estaban igual; que en la parte de la casa no están tan visibles como en la parte del centro; que la parte del centro es más alta, la casa del testigo es baja y tiene que venir de mayor a menor. A nuevas preguntas de la demandante, contestó: Que al decir que se veían las peladuras del suelo, quiso decir que se veían bolladuras, pero el alambre no se podía distinguir desde el suelo porque es del mismo color; que esas peladuras las observó por la parte de arriba en diferentes sitios.''

El testigo Javier Ramos declaró como sigue:

''Que miraron por abajo y no tenían ningún desperfecto los alambres eléctricos; que sería por arriba, porque la parte de abajo no tenía ninguno; que no puede decir lo que se observaba por la parte de arriba, porque hubiera tenido que

subirse para verlo; que sí observó que hay partes donde el
alambre está más fino que en otras; que por abajo no se
podía distinguir si el alambre eléctrico tenía algun desper-
fecto; que no recuerda si la calle esa estaba regada en el
centro, pero que estaba seguro que donde estaba ese indivi-
duo estaba seco.''

De las anteriores declaraciones aparece que se ha discu-
tido el hecho de si las partes expuestas de los alambres de la
luz eléctrica podían ser vista desde abajo, o sea del sitio donde
Rodríguez se encontraba parado, resultando la preponderan-
cia de la prueba en sentido negativo. Pero no existe prueba
alguna tendente a demostrar que Rodríguez o cualquiera otra
persona razonable pudiera suponer que por estos alambres
pasara una corriente mortal, y que siendo ellos para el alum-
brado no debía pasar por los mismos una corriente mayor de
110 *volts* que es enteramente inofensiva. Y no existe prueba
alguna en los autos de que Rodríguez fuera un experto en
electricidad. En realidad resulta que él era solamente un
trabajador de la compañía de teléfonos que ganaba un dollar
diario, en cuyo trabajo había estado desde hacía dos años.
Puede ser que él no empleara el medio más seguro para ex-
tender los alambres. Es muy fácil examinar cualquier acci-
dente y encontrar por lo menos una docena de medios por los
cuales hubiera podido evitarse. Como ha dicho David Crock-
ett: ''Si supiéramos de antemano lo que luego sabemos, nunca
dejaríamos de estar en lo seguro.'' A pesar de esto, el em-
pleado del teléfono tenía el derecho de confiar en que la com-
pañía de la luz eléctrica había cumplido con su deber y no
era de esperarse que él tuviera conocimiento de que una co-
rriente eléctrica que podía producir la muerte pasaba por
una acometida por donde debía pasar una corriente que sólo
debía ser de unos 110 voltas. Ciertamente que la demandada
en el presente caso pudo haber evitado el daño y la muerte
de Rodríguez ejercitando el debido cuidado o adoptando otros
medios semejantes. Por tanto, bajo todas las circunstancias
que aparecen de los hechos que han sido probados, no pode-

mos resolver que el interfecto fué culpable de negligencia contributoria. En apoyo de esta teoría podemos hacer referencia y citar algunas autoridadas que merecen nuestro respeto y que debemos seguir. En primer lugar haremos referencia a una sentencia de este tribunal dictada no hace mucho tiempo, en la que dijimos lo siguiente:

"La forma ordinaria, usual o conveniente de hacer una cosa, cuando un demandante no tiene motivos para suponer que hay peligro, lo exoneraría del cargo que se le hiciera con respecto a negligencia contributiva, si entra en el trabajo en la forma ordinaria. La prueba muestra que el ingeniero era un agente y empleado del demandado, y por la autoridad de las secciones 1803 y 1804 del Código Civil, los apelados son responsables de los actos de dicho empleado."

*Vargas* v. *Monroig,* 15 D. P. R., 32.

La Corte Suprema de los Estados Unidos ha adoptado también la doctrina más moderna y razonable que rige la cuestión de negligencia contributoria. En una opinión muy bien fundada se expone dicha doctrina en la forma siguiente:

"Sin tratar de discutir estas definiciones, o siquiera de compararlas será bastante para los actuales fines expresar que la regla generalmente aceptada y más razonable de ley aplicable a las acciones en que la defensa es la negligencia contributoria, puede expresarse como sigue: Aunque la negligencia del demandado haya sido la causa primera del daño que se alega sufrió el demandante, sin embargo, una acción promovida por tal motivo no puede sostenerse si la causa próxima e inmediata del perjuicio puede atribuirse a no haber ejercitado el debido cuidado y la precaución necesaria la persona perjudicada; *sujeta a esta condición que se ha establecido hace pocos años,* (habiendo sido enunciada primeramente en el caso de *Davies* v. *Mann,* 10 M. & W., 546) de que la negligencia contributoria por parte de la persona perjudicada no será un motivo para anular la acción si se demuestra que el demandado pudo mediante el ejercicio de cuidado y prudencia razonable haber evitado las consecuencias de la negligencia de la persona perjudicada. *Inland & Seaboard Coasting Co.* v. *Tolson,* 139 U. S., 551, 558, y casos citados; a saber: *Donohue* v. *St. Louis etc. Railroad,* 91 Missouri, 357; *Vicksburg etc. Railroad* v. *Patton,* 31 Miss., 156; *Deans* v. *Wilmington etc. Railroad,* 107 N. C., 686; 2

Thompson on Negligence, 1157; Cooley on Torts, [1st Ed.] 675; 4 Am. & Eng. Enc. Law, Tit. 'Negligencia Contributoria' 30; y autoridades citadas en la nota 1.

"\* \* \* al resolver la cuestión de si el interfecto fué culpable de negligencia contributoria, el jurado tenía la obligación de considerar todos los hechos y circunstancias relacionados con la cuestión, sin elegir un determinado hecho o circunstancia como predominante en el caso y con exclusión de todos los demás. *Cooper* v. *Lake Shore & Mich. Southern Railway Co.*, supra; *Baltimore etc. Railroad* v. *Kane*, 69 Maryland, 11." (*Grand Trunk Ry. Co. v. Ives*, 144 U. S., 429, 430, 433.)

En el caso de Tolson a que se ha hecho referencia, dicho alto tribunal se expresa como sigue:

"La otra instrucción fué como sigue: Hay otra aplicación de esta regla sobre la negligencia de la cual debe hacerse mención. Aunque la regla es que aunque se demuestre que el demandado ha sido culpable de negligencia, el demandante no puede ser indemnizado por los daños y perjuicios, siempre que se pruebe que el mismo ha sido culpable de negligencia contributoria la que ha contribuído en algo al accidente, sin embargo, la negligencia contributoria por parte de dicho demandante no exime al demandado ni quita al demandante el derecho que tiene a ser indemnizado si se prueba que el demandado ejercitando la debida prudencia y cuidado pudo haber evitado las consecuencias de la negligencia del demandante.

"La aplicación de la regla general según se ha expresado está sostenida por sentencias de alta autoridad y era aplicable al caso de autos. (*Radley* v. *London & Northwestern Ry.*, 1 App. Cas., 754; *Scott* v. *Dublin & Wicklow Ry.*, 11 Irish Com. Law, 377; *Austin* v. *New Jersey Steamboat Co.*, 43 N. Y., 75, 82; *Lucas* v. *Taunton & New Bedford Railroad*, 6 Gray, 64, 72; *Northern Central Railway* v. *Price*, 29 Maryland, 420. Véase también *Williamson* v. *Barrett*, 13 How., 101; 109.)

"De un examen cuidadoso de todas las instrucciones que se dieron al jurado, somos de opinión que ellas fueron aplicables a la prueba que se presentó; que en ellas se consideraban indebidamente las instrucciones que se pidieron; y que las mismas no contenían nada de lo que pudiera quejarse el demandado." (*I. & S. C. Co.* v. *Tolson*, 139 U. S., 558 y 559.)

Se ha dicho además en otra opinión muy clara y bien razonada, lo siguiente:

"La compañía tenía la obligación prescindiendo de cualquier disposición estatutoria, de observar que sus líneas eran seguras para aquellos que debido a sus ocupaciones tenían que acercarse a ellas. En cuanto a esto y con referencia a este caso particular somos de opinión de que la negligencia de la demandada causó la muerte de Clements.

"El interfecto creemos se encontraba legalmente en el techo de la galería. Estaba ocupado en un servicio en el que necesariamente tenía que correr el peligro de estar en contacto con los alambres del demandado ya pasando sobre ellos o por debajo de ellos. Es probable que esta última manera era la más conveniente y no hay prueba alguna que demuestre que al proceder él así incurriera en un riesgo mayor. Los alambres estaban visibles y todo el mundo los consideraba como seguros. No podía formarse una idea de la fuerza de la corriente que por ellos pasaba de una mera observación que se hiciera de los mismos. No había medio alguno para un hombre de educación general de distinguir si el alambre estaba con corriente o sin ella. Parecía que estaba perfectamente aislado. Por este hecho creemos estaba justificado en creer que no corría riesgo al ponerse en contacto con el mismo. Este tenía derecho a suponer que dichos alambres ofrecían seguridad y que la compañía había cumplido con las obligaciones que tenía de acuerdo con la ley. La obligación que él tenía era de tener cuidado de los defectos aparentes y no de aquellos que no podían notarse. Si hubiera tenido conocimiento del aislamiento defectuoso del mismo y se hubiera puesto en contacto con el alambre, entonces hubiera asumido el riesgo. El defecto estaba oculto y la envoltura del aislamiento era defectuosa. Es evidente que si hubiera estado debidamente cubierto, dicho alambre no hubiera matado a Clements. Es su muerte prueba concluyente del defecto en el aislamiento de dichos alambres, y de la negligencia del demandado. Él ejercitó debido cuidado al pasar por debajo del alambre en el cumplimiento de su deber, pues tenía derecho a suponer según las apariencias externas que el alambre ofrecía seguridad. Su proceder fué tal que no trató con él de exponerse directamente al peligro que dió por resultado su lesión. En una palabra, que no existía peligro alguno visible.

"Aun cuando el peligro fuera conocido, para que pueda alegarse negligencia contributoria debe demostrarse que el demandante voluntaria e innecesariamente se expuso al mismo, a menos que sea de tal

carácter que el demandante deba asumir el riesgo de la misma natu-
raleza del peligro a que se expuso.   Según la apariencia del alambre
así como la envoltura que tenía con la cinta aisladora, y el conocido
deber del demandado de hacer este aislamiento en determinada unión,
Clements no tenía motivos para preveer el daño a menos que conside-
rara la falta de la compañía demandada.   Esta falta fué la causa
de su muerte y su proceder al pasar por debajo o por encima del
alambre, fué una cuestión muy remota para que pueda considerársele
como negligencia contributoria.   (*Clements* v. *Louisiana Electric Co.,*
16 L. R. A., 44 y 45.)

Véase también el caso de *Davies* v. *Mann,* 19 Eng. Rul. Cases, 190.

Este caso de Louisiana del que se ha hecho tan extensa
cita es bastante parecido al caso que está sometido a nuestra
consideración y debe considerarse que el mismo resuelve la
cuestión de negligencia contributoria en favor del apelante.
Nosotros ciertamente así lo consideramos y procederemos de
conformidad con el mismo.

Aunque la apelada se funda principalmente en la opinión
de la corte sentenciadora para que se confirme la sentencia
dictada, y nos hace referencia a dos sentencias dictadas por
este tribunal que sostienen la acción asumida por la corte
inferior al declarar con lugar la moción de sobreseimiento, no
consideramos dichas resoluciones en tal sentido.   El caso de
*García* v. *S. J. L. & T. Co.,* 17 D. P. R., 626, que ha cido citado
por la apelada, es uno con referencia a negligencia contri-
butoria, pero los hechos son enteramente distintos del caso de
autos, no pudiendo, por consiguiente, considerarse dicho caso
como autoridad al resolver este caso.   El caso de *Díaz* v. *S. J.
L. & T. Co.,* 17 D. P. R., 69, que también ha sido citado por la
apelada es evidentemente contrario a la alegación que se ha
hecho en esta apelación y más bien se inclina a favorecer los
derechos del demandante que a ninguna otro cosa.   Por consi-
guiente, la ley, según la entendemos, así como los hechos de
este caso, según aparecen de los autos, están en contra de la
teoría de que la negligencia contributoria por parte del inter-

fecto impide al demandante que pueda ser indemnizado por daños y perjuicios.

La opinión a que llegó la corte sentenciadora de que Rodríguez era simplemente una persona que procedía con arreglo a la licencia que tenía, no cambia en manera alguna la obligación que tenía la demandada para con él como parte constituyente del público en general. Las corporaciones de servicios públicos que gozan de privilegios especiales, de franquicias de consideración, están obligadas a cumplir sus deberes para con las otras compañías, sus empleados y el público en general, de modo tal que razonablemente impidan que se ocasionen perjuicios como consecuencia de los elementos peligrosos empleados en su negocio ordinario. El dejar esta conección abierta por espacio de siete años sin ser inspeccionada hasta que el aislamiento que se hizo de los alambres se dañó quedando los alambres a descubierto, y el hecho de permitirse que una corriente mortal pasara continuamente con perjuicio de cualquier persona o personas que pudieran accidentalmente tocarlos, es una negligencia que poco le falta para ser criminal, y por consiguiente, con menos motivos pueden presentarse excusas de ninguna clase. En el presente caso se presentó una moción de nuevo juicio que fué desestimada por las mismas razones que se adujeron como fundamentos sobre los cuales se fundaba la sentencia; contra esta resolución inmediatamente se interpuso recurso de apelación. Como esta moción de nuevo juicio se fundó en las alegaciones de la insuficiencia de la prueba para fundar en ella dichas conclusiones de hecho y de derecho a que llegó la corte, y que la sentencia dictada en este caso era contraria a la ley y los errores de ley fueron cometidos por la corte en el juicio, las cuestiones allí presentadas han sido todas discutidas y resueltas al considerar la apelación interpuesta contra la sentencia, y no es necesario que consideremos con mayor extensión la moción sobre nuevo juicio, pues sólo basta con decir que debió haberse concedido.

Por consiguiente, aplicando la ley vigente con relación a

daños corporales que traen como consecuencia la muerte de una persona a los hechos que fueron probados en este juicio, somos claramente de opinión que se cometió un grave error por la Corte de Distrito de Ponce al dictar la sentencia apelada, la que debe revocarse y devolverse el caso a dicha corte sentenciadora, con instrucciones de que proceda a la celebración de un nuevo juicio en dicho caso, de conformidad con los principios enunciados en esta opinión.

*Revocada la sentencia y concedido un nuevo juicio.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados del Toro y Aldrey.

El Juez Asociado Sr. Wolf firmó haciendo constar estar conforme con la sentencia.