AMBROSIO MATOS SANTALÍS, en su carácter de padre con patria potestad sobre su hijo legítimo, VÍCTOR ENRIQUE MATOS, demandante y apelado, *v*. PORTO RICO RAILWAY, LIGHT & POWER Co., demandada y apelante.

Núm. 8128.—*Sometido:* Noviembre 7, 1940. *Resuelto:* Febrero 28, 1941.

*Brown, González & Newson* y *E. Córdova Díaz,* abogados de la apelante; *Eduardo Urrutia Martorell,* abogado del apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

Por la calle Buenavista, del barrio de Santurce, y a una altura mínima de 26 pies 4 pulgadas sobre el nivel de la calle, pasan las líneas de alta tensión que la demandada utiliza para el suministro de alumbrado. Por sus alambres, que se hallan enteramente descubiertos, pasa una corriente eléctrica de 2,300 voltios, sin que la demandada haya tomado otra precaución para evitar daños a las personas o a la propiedad que no sea la elevación a que ha extendido sus líneas. Sin que sepamos cómo, un alambre del grueso del usado para tender ropas, vino en contacto por una de sus extremidades con uno de los de alta tensión, quedando su otro extremo colgando muy cerca del pavimento. El 23 de octubre de 1936, el niño de doce años de edad Víctor Enrique Matos, que caminaba por dicha vía pública, vino en contacto con el alambre que pendía de las líneas de la demandada, recibiendo con tal motivo las quemaduras a que más adelante haremos referencia. Describiendo lo sucedídole, declaró el niño lesionado:

"Yo iba para un mandado, para después ir para la escuela, y cuando pasé por debajo de unos alambres de la luz, sentí una cosa que me agarró y me dió un cantazo. Cuando trate de quitármelo con esta mano, me quedé pegado. Entonces empecé a luchar con él para quitármelo y no podía, y después me quedé sin conocimiento. No sé nada más." (T. de E., págs. 99–100.)

La testigo María Nieves Cáceres, que presenció el accidente, lo describe así:

"...ví como el niño, que algo le llegaba a la espalda; él trató de quitárselo de encima y se cayó, y el cuello le humeaba, y yo me tiré a auxiliarlo...le salía por los dedos una lucecita azul...cuando yo

me acerqué al niño, ví que un cordón de arriba bajaba y seguía echando de un lado para otro...ya él había caído, ya lo había tirado, ya estaba inconsciente en el suelo...cuando aquello le tocó la espalda, hizo así y trató de quitarse algo y cayó boca arriba.'' (T. de E., págs. 20–21.)

El Dr. Arsenio Comas, que asistió al niño inmediatamente después del accidente, refiriéndose a las lesiones recibidas por éste, declaró que presentaba quemaduras extensas y múltiples de segundo grado en el tórax, espalda, brazo derecho, antebrazo izquierdo, región axilar izquierda, muslo izquierdo y en ambos talones; que presentaba además quemaduras de tercer grado de la mano izquierda con amputación parcial de los dedos índice y medio de dicha mano; que le aplicó el tratamiento indicado para esos casos, pero viendo que la mano no mejoraba, el 11 de noviembre tuvo que amputarle el resto del dedo medio y otra falange del dedo índice; que estuvo en el hospital hasta el 4 de diciembre de 1936. De acuerdo con la prueba, el niño es zurdo y según el Dr. Comas ha quedado con una incapacidad en esa mano de un 85 ó 90 por ciento. (T. de E., 43–45.)

El juicio de este caso terminó el 16 de enero de 1939 y tres días más tarde, el abogado del demandante radicó una moción debidamente notificada a la parte contraria, en la que acompañaba una copia certificada de una ordenanza aprobada por el Consejo Municipal de San Juan el 6 de agosto de 1908, titulada ''Ordenanza regulando las instalaciones eléctricas en la ciudad'', cuya sección 2a. prescribe:

''Sección 2a. Líneas exteriores.—Todas las líneas que provean alumbrado eléctrico dentro de la ciudad deben ser de alambre de cobre, cubierto, bien con una goma o el llamado 'Weatherproof', así como los que se usan para amarrar los mismos en los aisladores. El grueso de esta cubierta debe ser con arreglo al voltaje de la línea...''

En la referida moción, el abogado del demandante solicitó de la corte que tomase conocimiento judicial de la precitada ordenanza y si no lo creía procedente, abriese el caso a fin de ampliar su prueba para ofrecerla en evidencia.

Ninguna resolución dictó la corte ni el demandante practicó gestión alguna a ese respecto, dictándose sentencia el 15 de marzo siguiente a favor del demandante por la cantidad de $1,200 más las costas y $200 por concepto de honorarios de abogado. Ni en la sentencia ni en la opinión se hace la más remota referencia a la citada ordenanza. En otras palabras, la corte sentenciadora hizo caso omiso de dicho documento, cosa que admite la propia apelante.

Para evitar que podamos tomar conocimiento judicial de la ordenanza en cuestión, la apelante, con posterioridad a su informe oral, presentó en esta corte un alegato suplementario exponiendo razones por las cuales no debemos considerar dicha ordenanza a los fines de este recurso.

■■ Tratándose como se trata de un pleito iniciado en la corte de distrito, carecía dicha corte de facultad para tomar conocimiento judicial de esa ordenanza municipal. *El Pueblo* v. *Suárez,* 23 D.P.R. 243; *Pueblo* v. *Nochera,* 23 D.P.R. 604; *Pueblo* v. *Garzot,* 24 D.P.R. 231, y *Pueblo* v. *Solís,* 56 D.P.R. 284. Puesto que la corte de distrito no podía tomar conocimiento judicial de la referida ordenanza, tampoco la puede tomar este Tribunal al conocer del caso en apelación. Como la referida ordenanza no fué admitida en evidencia, toda vez que si bien se ofreció a través de la moción indicada, nunca se señaló una vista para su presentación, tendremos que ignorarla a los efectos de este recurso.

■ Resuelta así esta cuestión previa, pasaremos ahora a considerar el recurso en sus méritos.

¿Tenía la compañía demandada la obligación de mantener cubiertos los alambres de alta tensión que pasaban por la calle Buenavista en las condiciones indicadas, es decir, a una altura mínima de 26 pies 4 pulgadas sobre el nivel de dicha calle? En todo caso, ¿fué el defecto de aislar los alambres la causa próxima del accidente? Ésas son, de acuerdo con la prueba y las alegaciones, las cuestiones a resolver en este recurso.

En muchos de los casos que hemos consultado en el estudio de este pleito, se asegura que el alambre transmisor de una corriente eléctrica de alta tensión es una de las cosas más peligrosas que se conocen. No sólo es peligroso por ser capaz de causar la muerte al más ligero contacto, si que también por la circunstancia de ser imposible a la generalidad de las personas descubrir en un momento dado si por determinado alambre está pasando una corriente de alta tensión o si dicho alambre es inofensivo. De ahí que la jurisprudencia exija a los que se dedican a generar y distribuir tan peligroso elemento, que usen el más alto grado de cuidado para evitar causar daño. Pero a pesar de este alto grado de cuidado que se les exige, sostiene también la jurisprudencia que las personas o empresas dedicadas a este negocio no tienen la responsabilidad de un asegurador. En otras palabras, que no son responsables en cualquier caso que se cause un perjuicio, a menos que el daño haya sido producido por su culpa o negligencia al no usar un grado de cuidado o diligencia en proporción al peligro que el uso de ese elemento conlleva. Véase la monografía en 31 L.R.A. 566, titulada: *"Liability for injuries by electric wires in highways,"* suplementada por la más reciente en 22 L.R.A. (N.S.) 1169, bajo el título de *"Liability for injuries or death of traveler coming in contact with electric wire in highway."*

Como el alambre transmisor de corriente de alta tensión no ofrece peligro a menos que venga en contacto con las personas, la jurisprudencia exige que se cubra con material que impida que se escape la corriente sólo cuando haya la probabilidad de que pueda existir tal contacto. En 9 R.C.L. 1213, sección 21, se expone la regla en los siguientes términos:

"Aislación en determinados puntos o sitios.—Es razonable que el deber de proveer aislación esté limitado a puntos o sitios donde haya motivos para sospechar que las personas puedan venir en contacto con los alambres, y la ley no obliga a compañías generadoras o distribuidoras de electricidad a aislar sus alambres en todas partes, sino en aquellos sitios donde la gente pueda ir a trabajar, a negocios o

por placer, es decir, en aquellos sitios donde razonablemente pueda esperarse que vayan.''

Ilustraremos la doctrina enunciada con varios casos en que los tribunales la han aplicado.

En *Wetherby* v. *Twin State Gas & Electric Co.*, 25 L.R.A. (N.S.) 1220 (Vt. 1910), la compañía demandada había pasado tres alambres transmisores de corriente de alta tensión a lo largo de un puente de hierro. Los alambres quedaban, el más próximo, a 2 pies 3 pulgadas del exterior del costado del puente. Brazos de madera salían de las vigas (*cross-beams*) del puente por dos o tres sitios y sobre estos brazos de madera estaban colocados aisladores de cristal, por los que pasaban los alambres a una distancia unos de otros de 1½ pies. Los alambres estaban imperfectamente cubiertos. Un muchacho se trepó por la parte exterior del costado del puente y mientras jugaba con otros, uno de sus pies vino en contacto con el alambre más próximo, falleciendo casi instantáneamente. Aunque se presentó alguna evidencia tendente a demostrar que muchachos y otras personas solían treparse en los costados del puente con el fin de pescar, nada había en el récord que demostrase que la compañía o sus empleados tuvieran conocimiento de que los muchachos acostumbraban treparse donde se hallaban los alambres. La corte de primera instancia falló a favor del demandante. En apelación, se revocó la sentencia, expresándose la Corte Suprema en los siguientes términos:

''Desde cualquier ángulo que se considere la evidencia, la posición y actos del interfecto en el momento del accidente no eran incidentales a, o relacionados con el uso del puente para pasar por él a pie. (Pág. 1223.)

''. . . . . . . . .

''Nada hay en los alambres o en la forma en que estaban dispuestos que indujese o atrajese a los niños o a otras personas a ocupar una posición donde la corriente de electricidad que discurría por los alambres constituyese un peligro para ellos, y el ejercicio del más alto grado de cuidado y prudencia exigidos a la demandada en

el mantenimiento de sus líneas, no pudo sugerirle la probabilidad de un contacto con los alambres por persona alguna. Ése era un accidente que no podía razonablemente anticiparse. (Op., pág. 1224.)

"El negocio de transmitir electricidad, aunque indispensable a la sociedad, debe realizarse teniendo en cuenta la más alta consideración a la seguridad del público, y considerando además la imprevisión, inexperiencia, falta de juicio y errores de los niños de corta edad; pero las cortes no pueden convertir a las compañías de electricidad en aseguradoras de los niños más que de otras personas, ni exigir de tales compañías, en el desenvolvimiento de su negocio, un grado de cuidado, prudencia y previsión mayor que el que se exige a los hombres cuidadosos y prudentes en idénticas o en análogas circunstancias. (Pág. 1226.)"

En el caso de *Callaway* v. *Central Georgia Power Co.*, 160 S. E. 703 (Ga., 1931), se dijo:

"Aunque a una compañía de electricidad puede imputársele conocimiento de que los niños juegan en las calles de una ciudad, no puede razonablemente anticiparse que los niños, mientras juegan en las calles de la ciudad, al lanzar un alambre, vendrán en contacto con alambres no aislados extendidos sobre la calle a una altura de 20 pies solamente. Por consiguiente, la extensión y mantenimiento de los alambres no aislados cargados de corriente de alta tensión sobre las calles de una ciudad, extendidos a una distancia de 20 pies del suelo, en ausencia de una disposición legal que exija a la compañía aislar dichos alambres o mantenerlos a mayor distancia del suelo, no constituye negligencia en lo que respecta a un niño que juega en la calle y que en el juego accidentalmente tira un pequeño alambre y de ese modo recibe una corriente eléctrica (*electric shock*) que le causa daños. (Citas.)"

En el caso de *Bunten* v. *Eastern Minnesota Power Co.*, 228 N. W. 332 (Minn., 1929), luego de exponer la regla anteriormente enunciada al efecto de que no se exige a una compañía de luz eléctrica aislar sus alambres de alta tensión en aquellos sitios en que no hay posibilidad de que vengan en contacto con personas, se citan los siguientes casos ilustrativos de dicha regla:

"Se ha resuelto que constituye negligencia permitir que tales alambres (sin aislar) pasen a través de ramas de árboles, especialmente cuando los árboles se hallan cerca de las calles o en la proximidad de terrenos en los cuales juegan niños, puesto que la compañía debe prever que los niños pueden subirse a ellos. (Citas.) (Pág. 334.)

"... . . . . . .

"Es el deber de una compañía de electricidad que mantiene alambres transmisores de corriente de alta tensión en sitios donde el público tiene el derecho de estar y *existe la probabilidad de que vengan en contacto con tales alambres,* proteger al público contra ellos, aislándolos de manera efectiva o proveyendo otros medios de protección." (Pág. 334.)

En el caso de *Scott* v. *Pacific Power & Light Co., et al.,* 35 P. (2d) 749 (Wash, 1934), el demandante, empleado de un teatro cuyo techo era usado para la exhibición de anuncios, tuvo que subir a dicho techo para remover un poste de hierro del cual pendían ciertos anuncios, y mientras realizaba este trabajo el poste vino en contacto con un alambre de alta tensión de la compañía demandada, el cual se hallaba extendido horizontalmente a una distancia de 10 ó 20 pulgadas del edificio, sufriendo con tal motivo el demandante ciertas quemaduras. La corte confirmó la sentencia que se había dictado a favor del demandante, citando entre otras autoridades, de la obra de Curtis *"Law of Electricity"* el siguiente párrafo:

"Una compañía de electricidad debe esperar que las personas vayan algunas veces al techo de los edificios por placer o por negocios y por consiguiente debe ejercitar el debido cuidado a fin de que sus alambres conductores de electricidad que pasan sobre o cerca del techo estén debidamente aislados para evitar daños a personas que legalmente se hallen allí. Por ejemplo, si un hombre empleado para reparar el techo o para hacer cualquier otro trabajo en o cerca del mismo viene en contacto con un alambre defectuosamente aislado y recibe un *shock* que le hace daño, la compañía generalmente será obligada a responder de los perjuicios causados." Ob. cit., sec. 515, pág. 776.

En *Brooks* v. *Consolidated Gas Co.,* 70 N. J. Law 211, 57 A. 396, 398, al declarar a la compañía responsable de la muerte de una persona que vino en contacto con alambres defectuosamente aislados, mientras pintaba las canales de un balcón, dijo la corte:

"Cuando la compañía colocó su convertidor (*converter*) en la posición indicada, debió considerar y prever la posibilidad de que alguien que usase el balcón por placer o para hacer obras en él viniese en contacto con los alambres y recibiera el consiguiente daño, y debió tomar las precauciones que razonablemente hubiesen evitado tales resultados. Si la compañía tomó o no dichas precauciones y ejercitó el cuidado que las circunstancias demandaban, es cuestión a ser resuelta por el jurado."

En el caso de autos, declararon por la demandada dos ingenieros electricistas. El Sr. F. del Valle, que construyó la línea en cuestión en el año 1935, un año antes del accidente, y el Sr. Cosme, que la examinó o inspeccionó poco antes de la fecha en que se celebró el juicio. Del testimonio de uno y otro resulta evidente que la línea fué construída y conservada de acuerdo con los últimos adelantos de la ciencia. Hallándose los alambres a una distancia mínima de 26 pies 4 pulgadas del pavimento de la calle, claro es que no existe posibilidad alguna de que las personas que transitan por dicha vía pública, ya a pie, ora en cualquier vehículo, puedan venir en contacto con las líneas de alta tensión. Por lo tanto, no era necesario, dentro de las circunstancias de este caso, que los alambres estuviesen cubiertos para evitar hacer daño a las personas que por dicha vía pública transitasen, pues la separación a que del suelo se hallaban constituía una efectiva aislación.

Sostiene el apelado que este tribunal, en el caso de *Rosado* v. *Ponce Railway & L. Co.,* 18 D.P.R. 609, ha resuelto que es obligación de las compañías de luz eléctrica conservar constantemente aislados los alambres extendidos por las calles de la ciudad. En efecto, en el indicado caso se dijo:

"Además, según se ha resuelto en un caso de Louisiana, es el deber imperativo de una compañía de luz eléctrica que suministre electricidad por medio de alambres en lo alto, extendidos por las calles de una ciudad, conservarlos constantemente aislados con el fin de tenerlos en condiciones de que no se pongan en contacto con otros objetos, sin tener en consideración los hechos y causas que puedan ocasionar el contacto. *Herbert* v. *Lake Charles Ice Light & Waterworks Co.,* 111 La. 522, citando el caso de *Fitzgerald* v. *Edison E. I. Co,.* 200 Pa. St. 540, 50 A. 161, 86 Am. St. Rep. 732, y otros casos. Véase también *McLaughlin* v. *Louisville Electric Light Co.,* 34 L.R.A. 812, y *Haynes* v. *Raleigh Gas Co.,* 26 L.R.A. 813.''

En el caso de *Herbert,* supra, que sirvió. de base al párrafo precedentemente transcrito, se probó que los alambres de la compañía demandada hacía tiempo que estaban podridos y que la noche del accidente sopló viento y uno de los alambres de la compañía del teléfono, que también estaba en malas condiciones y de lo que tenía conocimiento la compañía demandada, vino en contacto con uno de los alambres de ésta, partiéndolo. El pedazo de alambre que así colgaba fué el que vino en contacto con Herbert y le ocasionó la muerte. Tales hechos demuestran que la compañía demandada fué negligente al no conservar sus alambres en condiciones de resistir la violencia de un viento ordinario y al no tomar las precauciones necesarias para evitar que sus alambres viniesen en contacto con los de la compañía del teléfono.

En el caso de *Rosado,* los hechos eran distintos de los del de *Herbert.* Allí se trataba de alambres secundarios que bajaban de las líneas de distribución al balcón de una casa, y estos alambres secundarios estaban defectuosamente aislados, pues de acuerdo con la prueba la cubierta que originalmente tenían había desaparecido en algunos sitios. De acuerdo con estas circunstancias, tratándose de alambres secundarios que descendían al balcón de una casa, era deber de la compañía mantenerlos constantemente aislados para evitar que las personas que tuviesen que aproximarse en alguna forma a dichos alambres, ya fuera para reparaciones

o por cualquier otro motivo, sufriesen daños. *Brooks* v. *Consolidated Gas Co.,* supra.

Posteriormente, la Corte Suprema de Louisiana, de donde procede el caso de *Herbert,* supra, ha aclarado su posición, entre otros, en los casos de *Bujol* v. *Gulf States Utilities Co.,* 147 So. 545 (1933), y *Freibert* v. *Sewerage & Water Board of New Orleans,* 159 So. 767 (1935), en los cuales se sostuvo la regla general de que sólo es necesario mantener los alambres aislados en aquellos sitios en que razonablemente pueda esperarse que se hallen personas por placer o para fines de negocio, a fin de protegerlas.

En el caso de *McLaughlin,* supra, citado en el de *Rosado,* también existía el deber de aislar los alambres, pues éstos pasaban cerca de un edificio y el demandante vino en contacto con ellos mientras se ocupaba en pintarlo. *Parsons* v. *Appalachian Electric Power Co.,* 100 A.L.R. 615 (W. Va., 1934).

En el caso de *Haynes* v. *Raleigh Gas Co.,* 26 L.R.A. 810, el accidente fué causado al romperse un alambre de alta tensión y colgar en la acera en momentos en que pasaba un niño por allí, quien vino en contacto con dicho alambre. Sostuvo la corte que puesto que el alambre que causó la muerte del niño era de la compañía, era de aplicación la doctrina de *res ipsa loquitur,* e incumbía a la demandada probar que la caída del alambre no fué causada por su culpa o negligencia. Se dijo por el tribunal:

"¿Se aplica la doctrina de *res ipsa loquitur* a un estado de hechos como el indicado, y constituyen dichos hechos un caso *prima facie* de negligencia contra la demandada, imponiendo a ella el peso de·la prueba para demostrar que no fué negligente? No se necesitan argumentos ni cita de autoridades para demostrar que los que usan las calles de una ciudad con la autorización de los que puedan concederle tal privilegio, para derivar beneficio, están obligados respecto a las personas que transiten por dichas calles a conducir su negocio de modo que no les cause perjuicio. Refiriéndonos especialmente al caso que nos ocupa, la compañía demandada tenía para con el interfecto el deber de quitar de su paso, mientras él se dirigiese a su casa o a

sus negocios, todos sus alambres. Era el deber de la demandada mantener la vía pública donde tenía sus postes y alambres sustancialmente en las mismas condiciones en cuanto a conveniencia y seguridad que existían antes de construir tales líneas. Se ha dicho que la negligencia es el incumplimiento de un deber. La evidencia de que había en la vía pública un alambre cargado de electricidad crea la presunción de que alguien ha dejado de cumplir un deber para con el público. Cuando a esos hechos se agrega la prueba de que el alambre capaz de causar la muerte fué puesto sobre la calle por la demandada, y que dicho alambre era propiedad de ésta y se hallaba bajo el manejo y control de sus empleados, y que por venir en contacto con ese alambre, el interfecto, que tenía el derecho de estar en la calle, fué muerto, se completa un caso *prima facie* de negligencia y el peso de la prueba recae sobre la demandada para demostrar que ese alambre cargado de electricidad no se hallaba en la calle por la culpa o negligencia de sus empleados y agentes.'' (Pág. 812.)

El caso de *Orta* v. *P. R. Railwway L. & P. Co.*, 36 D.P.R. 743, no es de aplicación al presente. Allí se trataba de un alambre de alta tensión, propiedad de la compañía demandada, el cual se hallaba en malas condiciones, se partió y vino en contacto con un niño, causándole la muerte. Se aplicó la doctrina de *res ipsa loquitur*, y como la demandada no cumplió con el deber de explicar cómo cayeron estos alambres, se le hizo responsable del perjuicio causado.

Si el alambre que causó el daño en el caso de autos hubiese formado parte de las líneas de la demandada o hubiese sido colocado allí por sus agentes o empleados, no vacilaríamos, de acuerdo con la jurisprudencia citada, en aplicar la doctrina de *res ipsa loquitur*, es decir, aplicaríamos la presunción *juris tantum* de que el accidente había sido causado por la negligencia de la demandada. Pero en este caso el alambre era extraño a las líneas de la demandada, y la prueba no revela que hubiese sido puesto allí por sus agentes o empleados. Esto nos lleva a considerar la segunda cuestión planteada: ¿Fué la negligencia de la demandada la causa próxima del accidente? Para resolver correctamente el problema así planteado, precisa que contestemos antes estas dos

preguntas: ¿Pudo razonablemente prever la demandada que alguien habría de tirar sobre sus· líneas, que se hallaban a una altura mínima de 26 pies 4 pulgadas sobre la calle, un alambre que viniese en contacto con ellas? ¿Tuvo la demandada conocimiento actual (*actual knowledge*) o constructivo (*constructive knowledge*) de la existencia de este alambre sobre sus líneas, con suficiente anticipación para removerlo y evitar el accidente?

■■ En el caso de *Colón* v. *Shell Co. (P.R.) Ltd.*, 55 D.P.R. 592, 618, refiriéndonos a la intervención de un agente independiente como causa próxima de un accidente, dijimos:

"Para que pueda sostenerse con éxito que el daño causado a otro es el resultado de la intervención de un agente independiente, es requisito *sine qua non* que al tiempo de ponerse en acción la fuerza que culminó en el daño, no existiera todavía el agente independiente, o en caso de existir ya, lo ignorase el demandado y no pudiese razonablemente preverlo, pues en caso de existir entonces y conocerlo el demandado, o no conociéndolo pudiendo razonablemente preverlo, entonces el supuesto agente independiente no es otra cosa que una situación de hecho o circunstancia que debió tener en cuenta el demandado al actuar o dejar de actuar en la forma en que lo hizo."

Es evidente que al tiempo en que la compañía demandada tendió sus líneas por la calle Buenavista, sin cubrir sus alambres, no existía el alambre en cuestión. Tampoco podía prever que alguien pudiese tirarlo sobre sus líneas. Por consiguiente, de acuerdo con la regla que acabamos de enunciar, es preciso concluir que el accidente sufrido por el demandante en este caso es el resultado de la intervención de un agente independiente.

En el caso de *Watral's Adm'r*. v. *Appalachian Power Co.*, 115 S. W. (2d) 372 (1938, Ky.), la compañía de luz eléctrica colocó los alambres de alta tensión sobre postes de 13 pies de altura a lo largo de o cerca de la vía pública, próximos a la casa de Kornelia Watral, en una sección densamente poblada de uno de los campos mineros poseídos por la demandada. Los alambres no estaban cubiertos (*insulated*). Un

niño estaba volando un volantín con un alambre de cobre, el cual hizo contacto con el alambre de alta tensión, recibiendo ciertas quemaduras y el correspondiente *shock*. Su madre, que trató de auxiliarlo, recibió también un fuerte *shock* y cayó al suelo con serias quemaduras. Los gritos de ésta atrajeron a su vecina, Kornelia Watral, quien trató de auxiliarla, y al hacerlo fué electrocutada. Se alegó en la demanda enmendada que en aquel sitio los niños de la vecindad acostumbraban jugar y volar volantines en aquella calle, y debajo y alrededor del alambre que causó el daño, y que los empleados de la compañía tenían conocimiento de ello. La corte inferior declaró con lugar la excepción previa de insuficiencia de hechos para constituir una causa de acción, dictando una sentencia que desestimó la demanda. Al confirmarla, la Corte Suprema dijo:

"La cuestión presentada fué: ¿Era el deber de la demandada anticipar que un muchacho volaría un volantín usando un alambre de cobre que podía venir en contacto con los alambres eléctricos no aislados?

"La regla general seguida por ésta y practicamente todas las demás cortes es que las personas o corporaciones que utilizan y operan alambres cargados con corrientes eléctricas de alta tensión, deben ejercitar el más alto grado de cuidado para la protección del público en todos aquellos sitios donde tales personas puedan legalmente estar. (Citas.) Aunque los que se ocupan en el negocio de producir y transmitir corriente eléctrica deben usar el mayor grado de cuidado y diligencia para evitar daños a cualquier persona que esté legalmente en un sitio, sin embargo tales personas o compañías no son aseguradoras contra todos los daños que puedan causarse por la operación de su negocio."

Se llama la atención en el caso anteriormente citado de que el estar los alambres a 13 pies de altura solamente no fué la causa del accidente, pues estaban fuera del alcance de los niños, y lo mismo hubiera podido ocurrir este accidente aunque el alambre estuviese a 25 ó 50 pies de altura. Tampoco afectó la resolución del caso el hecho de que los empleados o agentes de la compañía supiesen que los niños acostum-

braban jugar allí, pues no se probó que en alguna otra ocasión hubiesen utilizado alambre de cobre para sus volantines, y por el contrario lo que usaban era hilo, el cual no es trasmisor de la electricidad. Termina la opinión en el caso citado con el siguiente párrafo:

"Uno está obligado a anticipar solamente las consecuencias razonables y naturales de sus actos y no se le exige que tome precauciones contra aquellos actos que una persona razonablemente prudente, bajo las circunstancias, no anticiparía como probables de suceder. No encontramos alegaciones de hecho en la petición, según ha sido enmendada, que autorice la conclusión de que la apelada, en el ejercicio del más alto grado de cuidado, pudiera haber previsto que un niño volase un volantín con un alambre de cobre y recibiese los perjuicios resultantes del contacto del alambre de cobre con los de la línea."

En el de *Jones* v. *Union Ry. Co.,* 50 Misc. 651, 98 N. Y. Supp. 757, un mal intencionado tiró un pedazo de alambre sobre los de la demandada, quedando dicho alambre colgando del del *trolley.* No hubo prueba del tiempo que el alambre había estado en esa posición, excepto la declaración de un motorista de la demandada que ocho minutos antes del accidente pasó por allí y no lo vió. Dicho alambre así cargado de electricidad vino en contacto con un caballo y lo mató. Se resolvió que la evidencia no justificaba que se sometiese el caso al jurado, absolviéndose a la demandada de responsabilidad.

En el caso de *Luehrmann* v. *Laclede Gaslight Co.,* 127 Mo. App. 213, 104 S. W. 1128, se resolvió que una compañía de luz eléctrica no es responsable de un accidente causado por un alambre tirado por unos muchachos sobre sus líneas momentos antes de que una persona viniese en contacto con dicho alambre. Declaró la corte que imponer responsabilidad a la demandada en tales circunstancias equivaldría prácticamente a considerar a la compañía como aseguradora de la vida y miembros de todas las personas contra los daños causados por el acto ilegal de cualquier persona que ilegalmente interviniese (*tamper*) con sus líneas.

En el caso de *Brubaker* v. *Kansas City Electric Light Co.,* 130 Mo. App. 439, 110 S. W. 12, se resolvió que una compañía de electricidad no es responsable de los perjuicios resultantes del acto ilegal o negligente de transgresores (*trespassers*), al colgar un alambre de uno de los de la luz, si dicho alambre (el colgado por los transgresores) había estado allí un tiempo tan corto que la compañía, en el ejercicio del más alto grado de cuidado, no hubiera podido descubrirlo y removerlo.

De la prueba no resulta qué tiempo antes del accidente estuvo ese alambre colgando de las líneas de la compañía. Una testigo del demandante, que vivía frente al sitio del accidente, declaró que no lo había visto antes, lo que hace presumir que no había estado allí por mucho tiempo, pues de lo contrario dicho alambre hubiera sido descubierto por los vecinos.

No existiendo evidencia alguna de que la compañía tuviese conocimiento actual de la existencia de ese alambre extraño y no habiendo prueba de que dicho alambre hubiese permanecido allí durante un tiempo suficientemente largo para presumir que la demandada, ejercitando el deber que tiene de inspeccionar sus líneas, lo hubiese descubierto con antelación al accidente, no podemos hacer responsable a la compañía de actos de un extraño que ella no podía anticipar. *Graves* v. *Washington Water Power Co.,* 11 L.R.A. (N. S.) 452.

Es muy a nuestro pesar y solamente obligados por el consenso de la jurisprudencia en los Estados Unidos, que revocamos la sentencia apelada y negamos compensación al demandante. Si impusiéramos responsabilidad a la compañía apelante en este caso, invadiríamos un campo de acción vedado a la rama judicial; pero ello no obsta, y por el contrario creemos nuestro deber, urgir del organismo competente que exija a las compañías de servicio público dedicadas a comerciar con un elemento tan peligroso como lo es la corriente eléctrica, que pongan en práctica el único medio de aislar de manera efectiva la corriente, o sea, tender sus líneas bajo

tierra en la zona urbana de pueblos y ciudades, como es costumbre en el Continente, de esa suerte logrando el doble propósito de evitar las desgracias personales que con tanta frecuencia se repiten, a la vez que mejorar el ornato, eliminando esa red cada vez más complicada de alambres transmisores de corriente eléctrica que se cierne como una constante amenaza sobre las cabezas de los que con igual derecho que dichas compañías, hacen uso de las calles y sitios públicos en la zona urbana.

*Por las razones expuestas, procede declarar con lugar el recurso, revocar la sentencia apelada y en su lugar dictar otra desestimando la demanda, con costas al demandante.*

El Juez Asociado Sr. Todd, Jr., no intervino.